Dolores Lucille Workman et al., appellees and cross-appellants, v. Clara D. Workman, executrix of the estate of Lewis M. Workman, deceased, et al., appellants and cross-appellees, impleaded with First Continental National Bank and Trust Company, successor to Continental National Bank, et al., appellees and cross-appellants.

118 N. W. 2d 764

Filed December 14, 1962. No. 35148.

472

Herman Ginsburg and Max Kier, for appellants.

Perry & Perry and Crosby, Pansing, Guenzel & Binning, for appellees Dolores Lucille Workman et al.

Mason, Knudsen, Dickeson & Berkheimer, Woods, Aitken & Aitken, and Ralph H. Gillan, for appellees First Continental Nat. Bank et al.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, BOSLAUGH, and BROWER, JJ.

BROWER, J.

This is an appeal from the judgment of the district court for Lancaster County, Nebraska, in an equitable action based on alleged fraud after trial to the the court on the merits.

It is the second appearance of the case before this court. Our previous opinion is reported as Workman v. Workman, 167 Neb. 857, 95 N. W. 2d 186. We there reviewed the previous decision in which the trial court had entered a judgment of dismissal on a motion for summary judgment made by some of the defendants, and for judgment on the pleadings by the others. That decision reversed the judgment of dismissal and further directed the trial court to permit the minor defendants to appear and plead by their mother and next friend.

The action when formerly before us was pending on the third and supplemental petition filed by Dolores Lucille Workman, individually and as guardian of Joseph Workman, Robert Workman, and Francine Workman, minors, as plaintiffs. After the cause was remanded another petition was filed by these same minors by Dolores Lucille Workman as their mother and next friend. It adopted and ratified the allegations of the third amended and supplemental petition and made

further allegations by way of elaboration and clarification, but the two petitions substantially stated the same cause of action. Dellouise Workman Carroll, a married sister of the minors, had previously to our former opinion filed an answer which likewise adopted the allegations of the third amended and supplemental petition as her own. The action proceeded to trial on these two petitions, one of Dolores Lucille Workman, individually and as guardian, the allegations of which were adopted by Dellouise Workman Carroll, and the petition of the minors by their next friend.

Each of these petitions alleges that plaintiff Dolores Lucille Workman and defendant Frank M. Workman were formerly wife and husband. While the marriage relation existed Frank M. Workman fraudulently represented to the plaintiff Dolores Lucille Workman that it was desirable to convey real estate, then owned by them jointly and operated as partners, to corporations as a planned disposition of their estates and to save income and federal estate taxes, stating the income would still be available to the grantors in their lifetime and their children would be benefited by any surplus of income not used by them. Relying on these representations plaintiff joined with her husband in conveying all their real estate, consisting largely of apartment houses in Lincoln, Nebraska, to four corporations organized at that time. Two of these corporations were the defendants Capitol Investment Company and Capitol Land and Investment Company, each of which received such conveyances. The stock of both these corporations was transferred to the "Workman Trust" of which their children, the said minors, Joseph, Robert, and Francine Workman, and their sister Dellouise Workman Carroll, were beneficiaries, except 1 share in each, which was retained by Frank M. Workman. It alleged Frank M. Workman and his parents, Lewis M. Workman, since deceased, and Clara D. Workman, had entered into a conspiracy and fraudulent scheme and device both to

defraud the plaintiff Dolores Lucille Workman of her interest in the marital estate and also to render the gifts to said children and the Workman Trust wholly or partially ineffective. To accomplish this Frank M. Workman, as president of each of these corporations whose stock had been so assigned to the Workman Trust, made separate leases to his parents, either individually or as partners, or to corporations ostensibly owned by them, but really owned and controlled by Frank M. Workman; and that said leases were both for long terms of 10 years and for improvident rents to enable rentals of great value to be diverted and siphoned off before reaching the corporations or the trust in which the children were beneficiaries. As a result Frank M. Workman retained the use and ownership of the property whether title was ostensibly in his parents or the corporate entities; and that Frank M. Workman, with the apparent acquiescence of the trustees, so managed the real estate that little or no profit accrued to said corporations, which resulted in either no dividends or inadequate ones being declared. The defendant Apartment Supply House, a partnership, composed of said parents, and the defendant corporations, Capitol Enterprises, Inc., and Apartments, Inc., were alleged to be used for the purpose of receiving property pursuant to the scheme. The defendants Capitol Investment Company and Capitol Land and Investment Company were corporations used to further said scheme, and the Workman Trust was alleged to be established for the same purpose, and its trustees Continental National Bank of Lincoln, now First Continental National Bank and Trust Company, and Frederick J. Patz were made parties defendant after demand was made upon them to institute proceedings, and their failure to act.

The prayer asked the leases be adjudged null and void and cancelled; that a constructive trust be imposed upon the property of Clara D. Workman and Lewis M. Workman, the Apartment Supply House, Apartments, Inc.,

and Capitol Enterprises, Inc., as recipients of the diverted income in favor of the plaintiffs; and that an accounting be had of the rents and profits on the fraudulent leases in favor of the minors and Dellouise Workman Carroll, and for general equitable relief, including a personal judgment against Frank M. Workman, Clara D. Workman, and the estate of Lewis M. Workman, deceased.

For convenience the plaintiffs Dolores Lucille Workman, individually and as guardian of the minors, Joseph Workman, Robert Workman, and Francine Workman, and the minors themselves appearing by their next friend, and Dellouise Workman Carroll, may hereafter be referred to as "the plaintiffs." The defendants Clara D. Workman, as executrix of the estate of Lewis M. Workman, Clara D. Workman, Apartment Supply House, Frank M. Workman, Apartments, Inc., Capitol Enterprises, Inc., Capitol Investment Company, and Capitol Land and Investment Company, against whom the judgment was entered and who often join together in pleadings and motions, may at times be designated as the "principal defendants." At times the Capitol Investment Company and Capitol Land and Investment Company, whose stock was placed in the Workman Trust for the children, will be designated as the "children's corporations." The defendants First Continental National Bank and Trust Company and Frederick J. Patz, trustees of the Workman Trust, may be referred to together as "the trustees," and when separately mentioned, as the "trustee bank" or the "trustee Patz."

The principal defendants appeared specially to the petition of the minors by their next friend and challenged the jurisdiction of the court over their persons, contending the petition was a new and independent action by different plaintiffs and no summons had been served upon them. This special appearance was overruled but it was thereafter preserved in all filings of the principal defendants. The principal defendants then

filed a motion to require the plaintiff Dolores Lucille Workman to elect whether she prosecuted the action as next friend, or whether individually, or in her representative capacity. Thereafter, a motion to require the plaintiff to separately number and state her causes of action was filed by them. Both motions were overruled. They then demurred to this petition, generally and specially assigning as the grounds of the special demurrer that the court had no jurisdiction of their persons or the subject matter; that the action constituted a departure from the original action; that the plaintiff was without capacity to sue; and that there was a defect of parties plaintiff and defendant. The demurrer was overruled.

The principal defendants then filed an answer, containing a general denial and several affirmative defenses which, so far as are necessary to be discussed, were: That the cause of action pleaded was foreign to the original petition, filed April 8, 1955, and constituted a departure; that no claim had been filed in the county court of Lancaster County, Nebraska, in the Lewis M. Workman estate and the revivors were not revivors as to any claims of the minors or guardian; that all controversies between Dolores Lucille Workman and Frank M. Workman had been settled by stipulation, hence there was no cause stated against Frank M. Workman; that Dolores Lucille Workman is neither a proper nor necessary party to the action and that there is a misjoinder of parties plaintiff; and that Dolores Lucille Workman prosecutes as an individual, as guardian, and as next friend, and there is a misjoinder and defect of parties plaintiff.

The original answers of the principal defendants to the third amended petition of Dolores Lucille Workman, individually and as guardian of the children, contained these same affirmative defenses.

The defendant Joseph Workman, a minor 17 years of age, filed a motion objecting to the appointment of his

mother, Dolores Lucille Workman, as his guardian and her appearing for him as next friend and stating he did not desire to be so represented, and asks the action as affecting him be dismissed. This was overruled. It is so obvious that the duty of the representatives of minors and of the court in litigation affecting them is to protect their rights regardless of their willingness to give them away that his objections will not be again alluded to.

The trustee bank answered the petition of the minors by their next friend as it had previously answered the third amended and supplemental petition, admitting that demand had been made upon it to bring action to cancel the leases in question and that it had taken no action, and containing a general denial of all other allegations.

The trustee Patz had previously answered the third amended and supplemental petition with a general denial coupled with an allegation that he resigned as such trustee effective October 12, 1957; and that he never had any assets of the Workman Trust and had not participated or acquiesced in any fraudulent scheme or conspiracy. He never answered the petition of the minors by their next friend.

The plaintiffs filed an amended reply containing a general denial and further alleging that Frank M. Workman had not paid the rent to Capitol Land and Investment Company, a corporation, on the residential premises known as 940 South Cotner, occupied by Dolores Lucille Workman as provided in the decree of divorce granted, pursuant to this court's decision in Workman v. Workman, 164 Neb. 642, 83 N. W. 2d 368, which occasioned a loss to that company and, accordingly, to the plaintiffs.

The principal defendants filed a motion to strike the amended reply or, in the alternative, to strike all allegations except the denial of the minors by the guardian and next friend. This motion was overruled.

Thereafter a trial was had in the district court which

resulted in a judgment being rendered, on December 30, 1960, against the defendants Frank M. Workman, Clara D. Workman, Clara D. Workman, executrix of the estate of Lewis M. Workman, deceased, and Apartment Supply House, the parents' copartnership, in the amount of $176,977.52, and costs, and impressing an equitable lien on any property purchased by said defendants, either in their individual capacities or through Apartment Supply House, a partnership, Apartments Inc., a corporation, Capitol Enterprises, Inc., a corporation, Capitol Investment Company, a corporation, and Capitol Land and Investment Company, a corporation, between July 1, 1950, and December 30, 1960, and also entered the same judgment against the First Continental National Bank and Trust Company and Frederick J. Patz as though they were sureties, restraining the enforcement of the judgment against them until the assets of the primary obligors had been exhausted.

The principal defendants and the trustees filed separate motions for new trial.

The judge who heard the case and rendered judgment being unable to hear the motions for new trial, the hearing thereon was continued and the evidence transcribed and made available to the court. On August 15, 1961, at a subsequent term an order was entered which modified nunc pro tunc the judgment as entered by changing the word "plaintiff" as it appeared in the journal to "plaintiffs." This order further found the judgment against the trustees was not supported by the evidence and was erroneously entered, and that part of the judgment was canceled and withdrawn. It also found that evidence disclosed the furniture in the apartment houses conveyed to the children's corporations was included and intended to be transferred to those corporations and awarded it to them. It barred Clara D. Workman and Apartment Supply House from making claim thereto aside from certain subsequent acquired furniture purchased in the sum of $1,623.05 as to the Laverty Apart-

ments belonging to the Capitol Land and Investment Company, and $65.10 for the Jackson Apartments belonging to the Capitol Investment Company. It directed the children's corporations to pay said sums to the Apartment Supply House on taking possession of the furniture. In other respects the motions were overruled.

Separate motions for new trial were filed on the part of the principal defendants. Like motions were filed by the plaintiffs. These motions being overruled all the defendants, except the trustees, have appealed to this court and the plaintiffs have cross-appealed. Numerous errors have been assigned by the defendants and the plaintiffs in their respective briefs. Those that are necessary in arriving at this court's decision will be stated as they are discussed.

The first error assigned by the principal defendants is that the order of appointment of Dolores Lucille Workman as guardian of the minor defendants was not final because of an appeal pending from the order of the county court appointing her, which had not been superseded. This aspect of the proceeding was fully settled by our previous decision. This court held that where an infant's rights are involved and it appears to the court the infant is unrepresented by anyone with the power and duty of protecting his interests, it is the duty of the court to appoint one that has such power and duty. It directed the minors by their next friend to be substituted in place of the guardian. It became the law of this case and the substitution pursuant to the decision of this court was made, and no contention can be now made concerning it. Workman v. Workman, 167 Neb. 857, 95 N. W. 2d 186.

The principal defendants contend that the trial court erred in not sustaining the special appearance of the defendants made to the petition of the minors by their next friend because another summons was not served upon them. The petition of the minors by the next

friend upon being filed, as ordered by this court in Workman v. Workman, 167 Neb. 857, 95 N. W. 2d 186, relates back to their first appearance by their alleged guardian on filing the second amended petition in which the cause of action set out by the guardian names and refers to them and first sets out a cause of action in their favor as plaintiffs. Thereafter, all the defendants filed answer and moved the court either for a summary judgment or a judgment on the pleadings. The minors were the real parties plaintiff long before the special appearances filed by the defendants. No new service of summons was necessary.

The next assignment of error of the principal defendants is that the cause of action pleaded was foreign to that in the original petition and constituted a departure. This they urge has special significance as to the defendant Clara D. Workman, as executrix of the estate of Lewis M. Workman, because no claim was filed in his estate. The first petition filed in this action on April 8, 1955, sets out a fraudulent conspiracy, scheme, and device among the same persons but only relates it, as far as the one victimized is concerned, to Dolores Lucille Workman. It sought to pursue the assets and establish a constructive trust for her benefit only. The first amended petition stated the same conspiracy and fraud and seeks the same relief. It brought in more corporate defendants whom it was alleged were fraudulently used to further the scheme. Dolores Lucille Workman had by then secured a divorce and a judgment for alimony. This judgment then had restricted her interest in the marital estate and it was alleged that the fraudulent scheme was to reduce the marital estate and defeat the judgment for alimony. The second amended petition again set out the same fraud but went further and Dolores Lucille Workman joined as guardian, alleging her minor children there named and Dellouise Workman Carroll were also defrauded because of further steps taken by the conspirators pursuant to said scheme.

The contents of the third amended and supplemental petition have been summarized. The defendants' contention of a departure was set out and discussed in the previous opinion in Workman v. Workman, 167 Neb. 857, 95 N. W. 2d 186, but the court there finally stated that judgment on the pleadings was not the appropriate way to present the objection. All the petitions mentioned set out equitable actions to establish a constructive trust on the property, real and personal, of the defendants in which the diverted assets and income had been placed as a result of the same fraudulent scheme of the same individual defendants. It was not necessary that a claim in the decedent's estate be filed in the county court before bringing a suit in equity to establish a constructive trust and the lien of the plaintiffs on the property, real or personal, of the defendants. § 30-609, R. R. S. 1943. No action could have been maintained in the county court to fasten a lien on the decedent's real property as our Constitution gives that court no jurisdiction over the title to real estate. Bratt v. Wishart, 136 Neb. 899, 287 N. W. 769. Not only was the action one that could be maintained without a claim being filed in the county court, but the suit was commenced in the lifetime of the decedent. It was revived by two stipulations of the parties for revivor after his death, one joined in by special administratrix, the other by his executrix. The principal defendants contend that the revivor of the action was not a revivor as to any claims to be asserted by the minors and Dellouise Workman Carroll but applied only to the claims of Dolores Lucille Workman first set out in the original petition filed April 8, 1955.

"A suit for the establishment or enforcement of a constructive trust may be maintained by the person prejudiced or deprived of a benefit by the fraud, actual or constructive, which gives rise to the trust, or by the successors in interest of such person; * * *." 90 C. J. S., Trusts, § 433, p. 831.

"All persons may join in a suit to establish and enforce a trust who have similar interests, arising out of the same trust, and who are seeking the same relief, although their interests are not joint, and the joinder of a person without interest has been held not to be fatal; * * *." 90 C. J. S., Trusts, § 457, p. 895. In this state our statute, section 25-328, R. R. S. 1943, gives a person who has an interest in the matter in litigation and in the success of either party to an action a right to intervene in the litigation either before or after the issue has been joined and before the trial begins. This is what the minors did when their mother, as guardian, whether properly appointed or not, brought them into the litigation and set up their rights.

The principal defendants assign as error the trial court's overruling their demurrer for misjoinder of causes of action to the minors' petition by their next friend. In equitable actions considerable leeway is allowed in pleading and there arises the question in all such cases whether one or more causes of action are stated. "In order that there be but one cause of action, it is unnecessary that the wrong consist of a single act or omission, at least where the acts are closely connected and contribute to the accomplishment of a common purpose, or that the resulting injuries consist of but a single element; likewise, the amount sought to be recovered may be made up of several items, and the designation by plaintiff of one item as involving a different wrong than the others is not controlling." 1 C. J. S., Actions, § 65, p. 1188. Neither is it required that in such cases it affects all persons alike. In 1 C. J. S., Actions, § 72, p. 1203, it is stated: "A multiplication of parties does not necessarily increase the number of causes of action, even where defendants are not jointly, but severally, liable, and a complaint or petition may state but a single cause of action, even though it affects a number of persons, either as plaintiffs or as defendants, although defendants are liable or may be held liable upon

different and separate principles of law, or affects several distinct parcels of land separately owned by different persons. This is particularly true in actions of an equitable nature which require a working out and adjustment of the rights and liabilities of a number of persons, or the exercise of different forms of equitable power, and the granting of different forms of relief, it being proper in such actions to join as parties all persons interested, * * * and unnecessary that they be affected in the same manner or to the same extent. In like manner a complaint may state but a single cause of action, although it affects the same person or persons in different capacities." We hold there was but one cause of action stated for conspiracy, fraud, and deceit and that it sought a common object of establishing a constructive trust in which all the parties were interested.

Having found there was but one cause of action it follows that there was no error in overruling a motion to separately number and state the several causes of action, in overruling the demurrer for misjoinder thereof, and in finding there was no departure therefrom.

The principal defendants however urge that in any event after the settlement of the claim of Dolores Lucille Workman she should have been required to elect in what capacity she brought suit, or that she be dismissed from the action and her name stricken from the pleading. It is only necessary to ask what harm resulted to the defendants by not striking her name or dismissing her from the action. She appeared for the minors as their next friend. She was permitted to do so by the decision of this court. In that capacity she could assert any and all claims and take any step to prosecute the cause; and employ counsel and give to them the benefit of her knowledge of the facts.

It would seem it would make no difference to a trial judge sitting in an equity case in determining the issues whether her name remained on the pleading in more than one capacity. In Hert v. City Beverage Co., 167

Neb. 557, 94 N. W. 2d 27, this court said: " 'Before an error requires a reversal it must be determined that it was prejudicial to the rights of the party against whom it was made.' Buhrman v. Smollen, 164 Neb. 655, 83 N. W. 2d 386. See, also, Wolfe v. Mendel, 165 Neb. 16, 84 N. W. 2d 109.' " There was no prejudicial error in this respect.

The next error urged by the principal defendants was that the trial court failed to find the controversies between Frank M. Workman and Dolores Lucille Workman had been settled by stipulation and that therefore there was no cause stated against him. The stipulation of settlement particularly referred only to the claim of Mrs. Workman and clearly provided that either party could amend his pleadings after dismissal of the action by Dolores Lucille Workman and the issues be subject to trial upon the merits. That Frank M. Workman was still a party to the litigation was decided in our previous opinion and had become the law of the case.

The assignment of error with respect to overruling of the demurrer was not discussed by the principal defendants in regard to the portion thereof which alleged that the petition did not state a cause of action and need not be discussed by us.

We come now to the question of whether the judgment was supported by the evidence and was in accordance·with the law. This entails a discussion of the evidence at the trial. There is great conflict in the evidence in the bill of exceptions. It contains evidence of the plaintiffs which would substantiate their petition if given credence, and evidence which substantiates the principal defendants' position if believed. We will first outline the evidence supporting the two conflicting theories and then give the reasons that impel this court to its conclusions.

The plaintiff Dolores Lucille Workman and defendant Frank M. Workman were formerly wife and husband. They had acquired extensive real estate holdings con-

sisting principally of apartment-house property in Lincoln, Nebraska. In the fall of 1954, a divorce suit was pending between them. They had had trouble as early as 1949, and a previous action for divorce or separate maintenance had been commenced. Workman v. Workman, 164 Neb. 642, 83 N. W. 2d 368. In the year 1949, lawyers were consulted by Frank M. Workman concerning the formation of corporations and trusts in which to place their property. Shortly thereafter four corporations were formed and two trusts. The Workmans conveyed their property to these corporations, which included Capitol Investment Company and Capitol Land and Investment Company.

Real estate referred to as 1115 H Street and 1118 H Street, Lincoln, Nebraska, was, on November 23, 1949, exchanged and deeded by the Workmans for 54 shares of stock of the Capitol Investment Company, being the entire issue except one share kept by Frank M. Workman. In the testimony 1115 H Street is usually referred to as the Jackson Apartments, and 1118 H Street is referred to as the Troy Apartments. The Troy Apartments were being sold and no issue is presented with respect to it or its sale.

Real estate was on the same day exchanged for 335 shares of the capital stock of the Capitol Land and Investment Company, being the entire issue except one share kept by Frank M. Workman. The real estate was located at 429 South Twelfth Street and was called the Laverty Apartments. Also, there was included the family home of Frank M. Workman and wife at 940 South Cotner.

On February 20, 1950, the Workmans executed an irrevocable trust agreement for the benefit of their four children: Dellouse Workman Carroll, and the minors, Joseph, Robert, and Francine. The Bank and Patz were trustees and executed the agreement and accepted the trust. The 54 shares of Capitol Investment Company and 335 shares of Capitol Land and Investment Com-

pany were conveyed to this trust by the Workmans, as donors. The Workman Trust will hereafter be called the "Children's Trust." The trust agreement, among other things, provided that the trustees were to hold, manage, and care for the property and collect and receive the rent, issues, interest, and dividends thereon. They were to pay and apply the income not less than annually in equal shares to the children of the donors, and on termination of the trust to distribute the property to the children. They were given power to vote in person the shares of stock held in trust. It provided that they were to furnish the donors and the beneficiaries a statement annually of receipts and disbursements.

The gift tax return to the federal government discloses the gift of the capital stock was valued at $81,-301.64 above encumbrances. At the time of the leases herein mentioned and for several years afterward Frank M. Workman was president of both corporations; Ralph Gillan was secretary; and they with Frederick J. Patz, cotrustee of the Workman Trust, were directors of the children's corporations and other corporations managed by Workman.

On July 1, 1950, Frank M. Workman, as president of each of the children's corporations, made separate leases of the apartment real estate owned by them in the name of the corporations to the Apartment Supply House, a copartnership, of which his parents were the partners. Each lease was for a term of 10 years.

The lease of the Jackson Apartments by the Capitol Investment Company was for $275 per month; and the lease of the Laverty Apartments by the Capitol Land and Investment Company was for $565 per month. On December 1, 1950, the separate boards of directors of each company ratified all conveyances of real and personal property, including leases made in the past by the president and authorized the president and secretary to execute all such instruments in the future. On January 31, 1950, each company by resolution of its board of di-

rectors employed Frank M. Workman to manage the companies' properties for $2,500 a year from each corporation.

These two leases to the Apartment Supply House, a partnership, composed of Frank M. Workman's father and mother, are the alleged improvident leases which the plaintiffs claim were fraudulently made.

The evidence tending to show fraud introduced is very voluminous. We will at this point outline particular portions that impress the court as important.

In 1949, Lewis M. Workman was 66 years of age and Clara D. Workman was 63. They appear not to have been very successful in business. Workman was in a restaurant business between Twenty-sixth and Twenty-seventh Streets on Randolph Street in Lincoln, beginning in 1932 or 1933, and ending in 1944. Before that he ran a poolhall. In the restaurant business they had two employees, a waitress and dishwasher. Clara said they did pretty well making a living. They did not sell out. Lewis got sick and they just quit. The fixtures were sold later but Clara doesn't remember to whom. Lewis went to work at the Air Base but was not well and couldn't stay at work there. He quit after a few months. Clara received $35 or $36 a week cooking and making pies at the Sun Coffee Shop for 3 years, ending in 1947. After quitting the Air Base, Lewis drove a Yellow Cab and a Lincoln bus for about 2 years. Clara did not work again because Lewis was sick with a bad heart, asthma, and arthritis. He was hospitalized three times in 1955. Lewis testified that after quitting work for the interurban in 1929, he went into trucking and had about $1,600 invested in trucks which he wore out and he got very little for them. He estimated the loss on the trucks left him in the hole except for his home. He then started an antique furniture and repair business. Finally he quit and they had an auction sale and sold $500 or $600 of the stock, but it was going too cheap and he took 21 boxes home. In a deposition he said he didn't know

much about the Apartment Supply House business and had not been to the office for 8 or 9 months on account of illness and confinement in the hospital. He didn't owe Frank M. Workman a "dime." He paid off the only note Frank had over 5 years ago. He later admitted giving one of the notes for $10,000 to Frank. Frank has been taking care of the books and they could find out matters at the office. The $10,000 represented by the note shown him was all they ever got from Frank.

Frank M. Workman took one of his children and both his parents as three dependents in his income tax return for 1949. Dolores Lucille Workman took the other three children on a separate return. She testified that prior to 1949 Frank had given his parents an allowance of $20 a week.

The income of Lewis and Clara Workman began its phenomenal growth the year the leases to their partnership were given by the children's corporations. In 1950, they had a gross rental income shown on a joint return of $51,428.21, and after paying their son Frank $5,063.50, and taking $2,512.09 depreciation, their net income was $17,132.39. In 1951, gross rental income had increased to $85,647.70, and the net to $21,400.56. Thereafter their gross rental income varied from a low of $80,680.75 to a high of $92,949.62, to and including the year 1957. During the same years their net income varied from a low of $17,457.80 to a high of $38,158.42. The parents received other property conveyed to them by Frank M. Workman and his wife but the gross receipts from rentals of the apartments leased by the children's corporations must be set out later herein and it will be observed that those receipts constituted more than half of these rentals.

Frank M. Workman made the leases to his parents on behalf of the children's corporations on July 1, 1950, within less than 6 months of the execution of the Workman Trust agreement. Previously to setting up the corporations and the trust, according to his wife, he had told her that when rent controls were lifted they could

get more rents. Rent controls were terminated by an act of the Legislature of Nebraska which went into effect August 27, 1949, but the elimination of controls was delayed until its provisions were reported to Washington and it became fully effective November 1, 1949.

Grover K. Baumgartner, president of Lincoln Mutual Life Insurance Company, testified he took an application for a loan on the Jackson Apartments on December 26, 1951, from Frank M. Workman as president of the corporation. The application when presented had a letter attached from Loomis & Johnson, who appraise real estate, directed to Workman purporting to answer a letter from him requesting an appraisal. The letter states Workman had given them the information as to income upon which to base their appraisal. It shows the gross annual income to be $17,000. The operating expense was set at $5,100, 5 percent for vacancies and rent losses $850, an allowance for management of $850, and tax increase $175. This left a net income of $10,025. According to this report it contained 30 apartments and 10 garages. A similar application dated the same day in regard to a loan on the Laverty Apartments had a similar letter attached stating there were 60 apartments and the gross rentals were $27,000; the expense with similar allowances $10,950; and that the net rentals were $16,050. There was considerable evidence that there were 72 apartments at the Laverty, but it is disputed. A letter requesting an appraisal from a member of the same firm on November 30, 1951, signed by Frank M. Workman, shows the gross receipts of the Laverty Apartments were $27,033 in 1951, with like expense of operation $7,971, making net rentals $19,062, with like deduction for management, vacancies, and rent losses. It also shows the gross rentals of the Jackson Apartments to be $16,922, expenses $5,092, with the same deductions, leaving net $11,830. Frank M. Workman maintained that there were certain expenses pertaining to management and liability insurance not listed.

Baumgartner and other witnesses familiar with such rental properties testified that the leases were improvident; that they were for inadequate rentals considering the properties and their income and considering the children's corporations were to pay the taxes on the real estate; and that no provision was made to increase the rentals in case of a raise in the taxes during the 10-year period. Other witnesses testified the rentals were adequate. They base their opinions on the fact that the expense and trouble of managing the properties was eliminated thereby. Comparisons of leases were made with those of other apartment houses but certain of the leases with which the defendants made comparisons were those made sometime before the more difficult times and which by reason of the length of their term had extended into the time within which the leases in question were made.

Frank M. Workman explained the leases were given because he could not attend to them; that his parents could do so and were able to do so; and that they were able and responsible persons. He testified he had diabetes and had to take insulin, and his company properties were growing. He stated one reason for the leases being made to his parents was that there was a possibility of a bomb hitting the Laverty Apartments and leases to responsible parties would then pay off the mortgage.

Frank M. Workman received the following notes from his parents: December 3, 1949, $10,000; May 23, 1952, $8,000; December 31, 1953, $8,614.03; April 12, 1950, $10,-000; and March 10, 1953, $5,000, totaling $41,614.03. Their existence was discovered by Dolores Lucille Workman's attorneys when a deposition was taken in the divorce proceeding on November 26, 1954. Frank Workman said they were taken for services although it appears from all the evidence some were taken for loans. He said he never expected to collect them because his parents owed them to him and he figured some day "they would come down to an, estate, probably." Though

he was not figuring on collecting them, they owed him. Later he stated that part of these notes was taken just for tax purposes. Part of them was taken for services for management of Apartment Supply House when he received a 10-percent commission for management. He took them with the intention of letting the notes ride as it was cheaper for tax purposes to claim a salary. On December 1, 1954, within 5 days of taking the deposition in which he testified about these notes, he made an endorsement on most of them substantially similar to the following: "I do hereby cancel all interest due and accruing on this note since December 31, 1953, and do cancel and waive any rights to any interest on said note for all time in the future, and I hereby assign and deliver this note to The Continental National Bank, Trustee of the Frank M. Workman Trust (an entirely separate trust), without recourse, and I do hereby extend the maturity date of this note to the date of my death, or date of death of survivor of my parents whichever date is the later."

On July 15, 1950, Frank M. Workman entered into a written contract with the Apartment Supply House to manage its business, keep its records, to arrange to buy and sell its business properties, and to promote expansion for which he was to receive 10 percent of the gross income before expense. This he canceled July 24, 1954. He testified he canceled this contract about the middle of the year "because we seen how things were going." The income tax returns of Lewis and Clara Workman showed they paid their manager this 10 percent and that from 1950 to 1953, both inclusive, the payments amounted to $30,708.42. However, at least a substantial portion of these commissions was not paid in cash but was taken in the notes hitherto discussed.

If, as asserted, one of the chief reasons of Frank M. Workman in making the leases to the Apartment Supply House was to avoid so much work because of his physical condition due to diabetes, it seems he failed in his

objective. The evidence indicates he did practically all the management that he did before. Edna Kildaw, the caretaker of the Jackson Apartments from July 1950 to October 1958, testified she received no compensation except her apartment until October 1955, when she received $15 per month for cleaning. She testified that neither Lewis nor Clara Workman was on the premises for business purposes in the 8 years of her employment there. This caretaker received the rents, paid part of the bills, and deposited the balance in the bank. Frank M. Workman paid other bills. On a few occasions Edna Kildaw called Clara D. Workman by telephone when she couldn't get into touch with Frank. She kept a record for herself of the receipts and a duplicate of the deposit slips at the bank. These records of rentals deposited were in substantial agreement with the reports of Frank M. Workman given on the loan applications.

Clara D. Workman testified the caretakers did a lot of the business and she herself seemed to know little about it. She did not know what rent they paid for the Jackson Apartments or the Laverty Apartments, nor who paid it. She did not know how many apartments there were in the Jackson Apartments or the Laverty Apartments. She did not know how much rent they collected because the caretakers collected it. She did not know the number of stoves or refrigerators she owned. She says she thought the apartments were making money but she didn't know how much. Nor does she know whether the rentals produced at the Laverty Apartments were as much as $2,250 per month because, as she said, it doesn't belong to me, but to the children's trust fund. All she had was just the furniture. The caretakers collected and turned the rent over to Frank M. Workman's office. The money from the apartments doesn't come to her. Dellouise Workman Carroll was present when Frank brought checks and papers to Clara Workman for her signature. She testified Clara signed them without reading them and without question

and, from her appearance, without apparent understanding. Clara Workman, in a deposition taken February 26, 1955, admitted writing checks for her living expenses on the Apartment Supply House. They were for groceries and doctor and hospital bills, but she testified she wrote no checks for Apartment Supply House to pay expense and neither did her husband Lewis. Frank looked after that. Clara Workman testified Apartment Supply House owned a Cadillac automobile; that she had no driver's license but was learning to drive; that Lewis drove it but a few times; and it was used by Frank generally.

A witness Emma Sommers testified Clara D. and Lewis M. Workman were formerly her sister-in-law and brother-in-law; that although the relationship terminated in 1918, they continued to be friendly and close. The witness visited their home in October 1949. She was there about a month. She was in Lincoln throughout October and stayed overnight at the home of Lewis and Clara Workman. While Lewis and Clara were there, Frank came in. Frank stated that Lucille wasn't able to take care of the children and he was going to fix it so she "couldn't have nothing" as she had nothing when they were married. Frank said he was disgusted with "Lucille" and that she deserved nothing. Lewis Workman stated in the conversation that "Lucille" wasn't in her right mind. Clara, Lewis, and Frank discussed putting her in an institution, and Frank said they were going to put the money and property in a trust for the children. This witness was again visiting at the home of Lewis and Clara in February of 1950. Frank was there and he said everything was put in the children's trust fund so Lucille couldn't get anything. Lewis and Clara then said that that was a good thing. The witness testified that prior to 1949 Frank was giving the parents $20 a week and that they had accumulated no money or property prior to 1949. Lewis, she said, was not able to work in 1949.

The evidence shows that from large profits from sales of other property conveyed to the parents by Frank M. and Dolores Lucille Workman, and from rentals received from the apartments leased to them from the children's corporations and the other properties so conveyed, that the parents bought a motel in Columbus, Nebraska, which was in June of 1954, placed in a corporation named Apartments, Inc., a defendant herein. From rentals on the motel and from rentals from the other property vested in them by conveyances from their son, his wife, and the children's corporations, the parents bought a motel called the Country House Motel near Omaha, Nebraska, for $87,500, which property was placed in the name of a new corporation, the Capitol Enterprises, Inc., another one of the defendants. Lewis M. Workman and Clara D. Workman owned all the capital stock in these corporations. They originally owned all the capital stock of Capitol Enterprises, Inc., but later it was transferred to Frank M. Workman for $1,000.

That the furniture in the Jackson and Laverty Apartments was originally given and transferred to the children's corporations is clearly shown by the written offer of Frank and Dolores Lucille Workman to exchange the real estate for the capital stock. Frank M. Workman admits the children's corporations owned this furniture on February 20, 1950. He states this furniture was sold to his parents in 1950. The income tax of the parents shows they took depreciation on this furniture in 1950 and the same was listed as purchased on May 20, 1950. Frank M. Workman testified the furniture was sold but he was not sure how it was paid for. There might have been a note when the deal was made. He was not sure whether the note was one of those given to him or not, but didn't think so. He thought it was paid for by borrowed money from the National Bank of Commerce. He then stated they made the deal for the furniture and gave a note with the understanding they were to borrow the money, which he said they did. The income

tax return of the Capitol Investment Company for the year 1950 shows a sale of furniture for $3,500 and a capital gain thereon of $1,336.30. The balance sheet, schedule L of the return, shows notes and accounts receivable of $4,500. For the same year the return of the Capitol Land and Investment Company shows a capital gain of $1,511.15, but no capital gain sheet is attached to indicate what was sold and the balance sheet, schedule L attached, shows nothing to indicate corresponding cash or notes in the assets at the close of the year. A consolidated balance sheet of all the Workman corporations given by Frank M. Workman on making application for loans, November 4, 1950, shows no notes belonging to either of the children's corporations. Both corporations have some furniture. The cash balances of each are less than $300 and only the Capitol Investment Company has any accounts receivable which were $4,500. The evidence does not disclose how the furniture was ever paid for. Frank M. Workman, however, maintains that the furniture was owned by his parents and that was one of the reasons for making the leases at a less rental; and that the furniture had a rental value of five dollars an apartment per month. With between 90 and 100 apartments in all, this rental of furniture would be quite substantial and it is not satisfactorily explained why such a sale should have been made with the resulting decrease of the earning power of the children's corporations.

In Peters v. Woodman Accident & Life Co., 170 Neb. 861, 104 N. W. 2d 490, this court in a fraud case involving a corporation laid down the following rules: "A civil conspiracy is a combination of two or more persons to accomplish by concerted action an unlawful or oppressive object or a lawful object by unlawful or oppressive means.

"The principal element of conspiracy is an agreement or understanding between two or more persons to inflict a wrong against or injury upon another. It in-

volves some mutual mental action coupled with an intent to commit the act which results in injury.

"Fraud cannot be presumed or inferred without proof in a court of equity any more than in a court of law. However, courts of equity do not restrict themselves by the same rigid rules as courts of law in the investigation of fraud and in the evidence and proofs required to establish it. However, the proof must be sufficient to satisfy the conscience of the court that fraud is really existent, and to do this, it must be sufficient to overcome the natural presumption, which is always of considerable force, that men are honest and act from correct motives.

"To prove fraud direct evidence is not always essential. Inferences or presumptions of fraud may be drawn from facts and circumstances. However, such inferences or presumptions must not be guess work or conjecture but must be rational and logical deductions from the facts and circumstances from which they are inferred.

"What constitutes fraud is a matter of fact in each case. Deception finds expression in such a variety of ways that courts have studiously avoided reducing its elements to positive definitions. Courts content themselves with determining from the facts in each case whether fraud does or does not exist, for whatever satisfies the mind and conscience that fraud has or has not been practiced is sufficient.

"In an action in which relief is sought on account of alleged fraud, the existence of a confidential or fiduciary relationship, or status of unequal footing, when shown, does not shift the position of the burden of proving all elements of the fraud alleged, but nevertheless may be sufficient to allow fraud to be found to have existed when in the absence of such a status it could not be so found, and thus to have the effect of placing the burden of going forward with the evidence upon the party charged with fraud.

"An officer or director of a corporation occupies a fiduciary relation to the corporation and to stockholders.

He is treated by courts of equity as a trustee, and as such is ordinarily personally liable to beneficiaries of a fund for any misapplication of the fund to other beneficiaries not entitled thereto.

"Value of property is always a matter of judgment, and a contract based upon inadequate consideration will not be set aside for that reason alone, unless, as the rule is generally stated, the inadequacy is so great as to furnish of itself convincing evidence of fraud."

From a consideration of the evidence in the light of these rules we are satisfied that fraud was proved by clear and convincing evidence. Frank M. Workman, as president of the children's corporations, stood in a fiduciary relation to its stockholders. Especially is this true when these stockholders were his minor children of whom he was then the guardian. He prevailed upon his wife, from whom he held a power of attorney, to convey the apartment houses to the corporations for the apparent benefit of their children. He stood in a fiduciary relation towards her also. Shortly thereafter he made the improvident leases to his parents and conveyed to them the cream of the rentals from the property. In his fraudulent actions the parents participated. They conversed with him about it beforehand. The parents knew of the income reaped from their son's actions. They executed income tax returns year after year disclosing it. From straightened circumstances they suddenly became affluent. The bazaar note transactions indicate the dealings between Frank M. Workman and his parents were not in good faith. The parents' testimony indicates they really considered the income they received as not theirs, but Frank's.

The trial court computed the income diverted and for which judgment was entered, and made a lien on the property of the parties whether standing in their names or in that of their corporations in which the fruits of the fraud were placed. The computation was year by year and to the amount diverted each year was added inter-

est from the close of the year to the date of judgment. Those computations are here set out. The net amount diverted to December 31, 1950, was $8,139.84; interest thereon from said date to the day of judgment, December 31, 1960, at 6 percent, $4,883.90, making a total of $13,023.74. Thereafter, net receipts at the end of each calendar year followed by the interest to the date of judgment are here set out: 1951, $16,279.67, interest $8,791.02; 1952, $14,225.58, interest $6,828.24; 1953, $13,798.41, interest .$5,795.30; 1954, $11,918.23, interest $4,290.54; 1955, $16,740.17, interest $5,022.05; 1956, $15,097.48, interest $3,624.20; 1957, $14,619.20, interest $2,631.45; 1958, $8,732, interest $1,047.84; and 1959, $9,210.57, interest $558.63. For the period ending at the termination of the leases on July 1, 1960, the net rentals were $4,605.29 and interest to judgment, $138.16. The sum of these amounts of each year's rentals ·diverted, with interest, makes the total of $176,977.52, for which judgment was entered.

For the full years 1951 to 1959, inclusive, these figures were computed from the books of the Apartment Supply House, being the annual summary of income and expenses shown on the Laverty and Jackson Apartments. The computation was accomplished ·by taking the sum of the gross receipts from the two apartments and first deducting 10 percent thereof, from the gross, which the court allowed the defendants collectively for management. Thereafter the actual expense of the two apartments as disclosed by these annual summaries was deducted also.

The computation of the first 6-months' income and expenditures for the period beginning July 1, 1950, to December 31, 1950, was of different character. The trial court approximated this income by taking half of the year closest to the 6-months period both for income and expenditures. There· is other evidence· however justifying this amount. The computation for the last 6 months was taken by combining the monthly reports

of January to June, inclusive, of the year 1960 from the monthly summaries.

The trial court's allowance of 10 percent of the gross receipts for management resulted in the sum of $43,-875.79 being allowed the defendants, collectively, over the 10-year period.

The principal defendants assign as error the inclusion of interest in the judgment on the amount found due at the end of each year from that date to the entry of the judgment. The trust agreement creating the Workman Trust provided that the income received be paid and credited to the beneficiaries not less than annually in equal shares. The children's corporations were reporting their income for taxation at the close of the year. The summary of income and expenditures of the Apartment Supply House was made as of that day. We find it should have been ascertained and distributed at that time to the trust and by it to the children who were its beneficiaries had the trust been operated as it was intended. In 47 C. J. S., Interest, § 13, p. 23, it is said: "Interest should be allowed where the conduct of a party merits its allowance against him, as for some misconduct, breach of trust, or dereliction of duty, or where the person retains funds belonging to another actually making interest thereon. * * * Where money or property belonging to another was not paid or turned over to the person entitled to receive it at the time when it should have been paid or turned over, interest is generally allowed." We think interest should have been charged thereon.

These defendants also assign error in the judgment of the district court which disregarded the corporate entities of the children's corporations and entered judgment in favor of the children as beneficiaries of the Workman Trust. It appears these beneficiaries were entitled to the income in any event. "The relief ordinarily granted in equity is such as the nature of the case, the law, and the facts demand, not at the beginning

of the litigation, but at the time the decree is entered." Conrad v. Kaup, 137 Neb. 900, 291 N. W. 687. "A court of equity will not permit mere corporate forms to serve as a cloak and a shield to the perpetration of a fraud, but will examine the whole transaction, looking through corporate forms to the substance of things, to protect the rights of innocent parties, or to circumvent fraud." Ehlers v. Bankers Fire Ins. Co., 108 Neb. 756, 189 N. W. 159.

The principal defendants assign as error the correction by the trial court of certain portions of the judgment entered herein at the hearing upon the motion for new trial. The correction was made after term on which the judgment was entered but at the hearing of the motion for new trial filed within the time specified by law. The correction consisted of three matters, the first to make the recitation of the judgment creditor "plaintiffs" instead of "plaintiff." The judgment as a whole clearly shows that it was in favor of the plaintiff minors, who appeared by their next friend, and Dellouise Workman Carroll. The notes on the trial docket are that the judgment was in favor of the plaintiffs. The court did not err in correcting the journal accordingly. In such a case it may be done nunc pro tunc. The second was in the court's finding that the furniture in the Laverty and Jackson Apartments, as to which no finding had originally been made, belonged to the children's corporations and entering judgment accordingly. The evidence hitherto discussed seems to substantiate this change in the judgment. A motion for new trial which has been duly and timely filed may be heard at a subsequent term and the court may then pass upon the motion and enter its judgment on the motion for new trial. Petsch & McDonald v. Hines, 110 Neb. 1, 192 N. W. 963.

At a hearing had on a motion for new trial, even after term, in an quitable action heard before the court alone. it would seem that the trial court should be given

an opportunity to correct its own errors in the previous findings and enter the proper judgment, if that can be done without the necessity of a new trial of the whole case. This question poses no special significance in the case before us, however, as it is an equitable action before this court on appeal and is tried by this court de novo.

The plaintiffs as cross-appellants assign error to the trial court in its judgment allowing a credit of 10 percent of the gross rentals collected from the Laverty and Jackson Apartments for the service of the defendant Frank M. Workman in the management of the apartment properties. They point out that the litigation was caused by the fraudulent conspiracy, scheme, and device of the defendants Frank M. Workman, Lewis M. Workman, and Clara D. Workman, and that in such circumstances they are not entitled to compensation for their services. This court in considering the compensation to be paid the trustees who had been guilty of a breach of trust in In re Estate of Linch, 136 Neb. 705, 287 N. W. 88, quoted the authorities there cited with approval as follows:

"In 2 Perry, Trusts and Trustees (7th ed.) 1556, sec. 919, the author states: 'In many states the commissions and compensations of the trustees depend upon their fidelity in the administration of the trust. If they are guilty of any breach of trust, or of any vexatious or improper conduct, the courts can withhold all compensation, or they can allow such compensation as will pay for the value of their services so far as they have been beneficial to the estates.'

"In 65 C. J. 910, with reference to compensation allowance to trustees, we find the following language: 'The accepted rule in this country at the present time, however, is * * * for courts of equity to exercise a just discretion and make or withhold allowance as they consider the particular circumstances require.' " Other cases have withheld compensation entirely to trustees

who have betrayed their trust. Baird v. Lane, 115 Neb. 413, 213 N. W. 512.

In the case before the court Frank M. Workman occupied a trust relation toward his minor children, the stockholders of the corporations of which he was president. Rettinger v. Pierpont, 145 Neb. 161, 15 N. W. 2d 393. He was likewise the natural guardian of his children and was their legal guardian at the time of the leases in question. His parents were fully aware of the relationship when they entered into the scheme to defraud the children's corporations. It must be conceded that Frank M. Workman was an able operator of apartment houses; that it was his operation and not that of his parents is apparent. He had been very successful in such enterprises; that he managed those involved in the leases well cannot be doubted. In this situation a court of equity is given considerable discretion in allowing compensation for his services even though he was derelict in his duties. On the other hand he has not been wholly uncompensated. He received a salary as president of each of the children's corporations of $1,566.66 for the year 1950. In the years 1951 and 1952, he received $900 from each of them. Thereafter, he was paid $900 a year from one and $600 from the other up to the year 1959. His parents made substantial payments in cash for managing their properties, including those held under these leases. Other payments were evidenced by the note transactions which have been alluded to previously. The trial court allowed the defendant Frank M. Workman 10 percent of the gross rentals for his management of the property when a considerable portion of the necessary work was done by caretakers who collected the rents, paid a portion of the expense, and deposited the rest. Under these circumstances the allowance of 10 percent of the gross rent collections is in excess of that which was proper. There is evidence tending to show that 5 percent would have been adequate, though there is that which is contrary.

Under the circumstances they should have been allowed only 5 percent. This requires that this court compute the amount that should be added to the judgment, with interest. We have placed the gross rents from both apartments, as shown from the evidence, in the first column; the 5 percent which must be refunded, in the second column; and the interest from the close of each year to the date of the decree, which should be refunded also, in the third column.

| Half year ending | Gross Receipts | 5 percent | Interest to Decree |
|---|---|---|---|
| January 1, 1951 | $25,285.70 | $1,264.28 | $ 758.40 |
| Calendar Yr. 1951 | 44,448.27 | 2,222.40 | 1,200.06 |
| " " 1952 | 43,528.90 | 2,176.44 | 1,044.48 |
| " " 1953 | 44,152.25 | 2,207.60 | 926.90 |
| " " 1954 | 44,855.11 | 2,242.75 | 807.00 |
| " " 1955 | 46,274.62 | 2,313.70 | 694.00 |
| " " 1956 | 46,279.58 | 2,313.95 | 555.20 |
| " " 1957 | 43,742.79 | 2,187.00 | 393.66 |
| " " 1958 | 39,720.22 | 1,986.00 | 238.32 |
| " " 1959 | 42,128.56 | 2,106.40 | 126.36 |
| To July 1, 1960 | 18,341.82 | 917.00 | 27.25 |
| | | $21,937.52 | $6,771.72 |

The amount of 5 percent or half the commission allowed, together with the interest thereon, makes the sum of $28,709.24, which amount should be added to the judgment recovered herein.

The gross rentals for the calendar years are taken from the summary of income and expense from the books of the Apartment Supply House at the close of the year. The 6-month period at the beginning of the term of the leases is approximated by taking half of the year as was done by the trial court.

The plaintiffs as cross-appellants, assign error of the trial court because of its failure to enter a judgment against Frank M. Workman alone for rentals they claim were owed on the residence property referred to as 940

South Cotner. It was the residence of Frank M. and Dolores Lucille Workman prior to their divorce, but had been conveyed to the Capitol Land and Investment Company, one of the children's corporations. The opinion of this court in the divorce action of Workman v. Workman, 164 Neb. 642, 83 N. W. 2d 368, directed that Frank M. Workman pay the rent on this home to the children's corporations. Prior to 1953 it was rented for $140 per month. Plaintiffs maintain that the evidence shows he had not paid all of this rent and thus reduced the income of the corporations. Frank M. Workman testified he had not paid the rent during the time when the district court in the divorce action had granted his wife, Dolores Lucille Workman, a temporary allowance pending the divorce action because she was then to pay the same. The decision of this court in Workman v. Workman, 164 Neb. 642, 83 N. W. 2d 368, decided in 1957, does not specifically state who was to pay the past-due rent. The order of the district court granting the temporary support is not in evidence. Workman testified the rent while the temporary order was in force was paid by neither party to the divorce but that he subsequently paid the arrears back to the date of the Supreme Court decision. The income tax returns of the Capitol Land and Investment Company, for 1955 and 1956, showed some rent was paid by someone during those years. Workman testified the rent was reduced to $110 in 1958 because the children's corporations no longer paid for the utilities at the residence. The corporations' income tax returns indicate the utilities were paid by the corporations previously, but not in 1958, and the returns of a later date are not in evidence. The 1958 return shows more rental than currently required to be collected indicating that past-due rents were being liquidated. Whether more was paid later and in what amounts are not shown. The plaintiffs offered no substantial evidence themselves except the income tax returns. The evidence on this matter is confusing and un-

satisfactory and the burden in that respect was on the plaintiffs and no judgment should be entered thereon.

The plaintiffs assign error to the trial court in the judgment finding that the Capitol Investment Company, a corporation, should pay the sum of $65.10, and the Capitol Land and Investment Company should pay the sum of $1,623.05, to the Apartment Supply House for furniture purchased by it that went into the Jackson and Laverty Apartments during the lease. The depreciation schedule in the income tax reports of Lewis and Clara Workman shows new furniture purchased during the term of the leases in at least those amounts. It is true that when property is commingled by a wrongdoer with his own in a manner that prevents identification of the several items, the wrongdoer may be deprived of that which was his. However, a court of equity has considerable discretion in such cases. Here the plaintiffs by this decision are given the rents from the properties, including the furniture so purchased. The furniture is by the court restored to the children's corporations which have now been reorganized. The amount which these children's corporations are to pay to reimburse the Apartment Supply House for the furniture is without interest. Under such circumstances we find no error in the trial court's judgment directing the payment of the purchase price.

The plaintiffs have assigned as error the ruling of the trial court which, on the hearing of the motion for new trial, sustained the motion with respect to the cotrustees and withdrew the judgment against them. The petitions filed in the action seem to join the trustees of the Workman Trust as formal parties only. It is alleged that the trustees "are made parties as the representatives of the trust which was established for the purpose of appearing to reduce the marital estate as a part of the fraudulent scheme and device devised by the defendant, Frank M. Workman." It is further asserted that the acts of Frank M. Workman were "with the apparent acquiescence of

the defendants trustee." The allegations concerning the conspiracy, scheme, and device refer to Frank M., Lewis M., and Clara D. Workman. Nowhere is any allegation made that the trustees joined in or participated in the scheme, fraud, or conspiracy, or that they even knew of it. A personal judgment was asked against Frank and Clara Workman and the estate of Lewis M. Workman, but not against the trustees. We fail to find any allegation in the petitions on which the cause was tried that would sustain a personal judgment against them, or to apprise them that one was sought. Neither were there any such allegations in the several prior petitions. They appear to be joined for the purpose of allowing the plaintiff minors and Dellouise Workman Carroll to maintain their action as beneficiaries of the trust. The direct right to challenge the leases was in the children's corporations. The cotrustees of the Workman Trust were in the first instance the holders of the stock in the corporation and had the derivative right to bring the actions as stockholders. It was necessary for plaintiffs to allege a request and a refusal or neglect of the trustees to bring action before the plaintiffs could proceed, and the trustees as the nominal holders of the stock in the children's corporations were proper parties to the suit. They were accordingly joined as defendants but from all that appears their joinder was as nominal parties in a representative capacity. Neither does the evidence show they took part in the fraudulent scheme or even knew of it, though it shows some lack of diligence in failing to look into the affairs of the corporation whose stock they held. The action of the trial court in vacating and withdrawing the judgment against them was without error.

We find no errors in the rulings of the district court except in allowing a commission to the defendants in the amount of 10 percent of the gross rentals received under the fraudulent leases. We have allowed only 5 percent commission. We have hitherto computed the amount of half of these commissions which had been

erroneously allowed in the district court. That which should be added by reason of this court's decision, with interest to the day of the original decree, is the sum of $28,709.24, making the amount of the judgment which should have been entered as of December 30, 1960, the sum of $205,686.76.

The judgment of the district court is modified as to the amount of the judgment only, and in other respects is affirmed.

AFFIRMED AS MODIFIED.