SERVICEMASTER INDUSTRIES INC., A DELAWARE CORPORATION, APPELLANT, V. J.R.L. ENTERPRISES, INC., A NEBRASKA CORPORATION, ET AL., APPELLEES.

388 N.W.2d 83

Filed June 6, 1986.   No. 85-162.

William R. Hadley of Fitzgerald, Brown, Leahy, Strom, Schorr & Barmettler, for appellant.

Robert F. Peterson of Venteicher, Laughlin, Peterson & Lang, for appellees.

KRIVOSHA, C.J., BOSLAUGH, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

BOSLAUGH, J.

On July 23, 1979, the plaintiff, ServiceMaster Industries Inc., entered into a license agreement with the defendant J.R.L. Enterprises, Inc., which authorized the defendant to operate a cleaning service business in Douglas County, Nebraska, using the ServiceMaster trade name, methods, materials, and equipment. The agreement provided for monthly reporting of gross sales by the defendant licensee and payment of 10 percent of the gross sales to the plaintiff.

This action was brought against the defendant licensee and John Richard Liebsack as a principal stockholder and officer of J.R.L. Enterprises, Inc., for an accounting of the amounts due the plaintiff under the licensing agreement and to enjoin the defendants from any further breach of the agreement.

The amended petition alleged that J.R.L. Enterprises, Inc., was the alter ego of John Richard Liebsack and that it had no genuine or separate corporate existence, and sought to hold

Liebsack personally liable for any amounts due the plaintiff from the defendant licensee.

The amended petition alleged:

2. Defendant, John Richard Liebsack, is an individual residing and doing business in Douglas County, Nebraska, and is the major and dominating stockholder and officer of defendant, JRL Enterprises, Inc. a corporation, organized and doing business under the laws of the State of Nebraska.

3. Defendant, JRL Enterprises, Inc., was organized by defendant, John Richard Liebsack, as his alter ego for the purpose of obtaining and operating under the ServiceMaster Service License Agreement described below.

4. Defendant company has never had, and does not have now, any genuine or separate corporate existence, that it has been used and exists for the sole purpose of permitting John Richard Liebsack to transact a portion of his individual business under a corporate guise in that:

(a) Defendant company has continuously from its inception to the present, been grossly and inadequately capitalized.

(b) Defendant corporation was insolvent at the time the ServiceMaster Service License Agreement described below was entered into and has remained insolvent to the present date.

(c) The defendant, John Richard Liebsack, has diverted corporate funds and assets through his own and other improper uses.

(d) The operations of the defendant corporation are carried on by John Richard Liebsack in disregard of the corporate entity.

ServiceMaster also alleged:

7. Defendants have failed to comply with the terms of such license agreement and have breached such agreement in each of the following respects:

. . . .

(g) By intentional false representation of defendants' financial condition in written reports upon which plaintiff

reasonably relied in determining the amounts due plaintiff under the agreement and in selling to defendant, on credit, property and equipment.

At the commencement of the trial the parties stipulated that J.R.L. Enterprises had underreported revenues attributable to the ServiceMaster license in the sum of $400,000 and to judgment against the corporation in favor of ServiceMaster in the sum of $40,000. ServiceMaster also agreed to dismiss a second cause of action with prejudice. The trial then proceeded only as to Liebsack.

At the close of all the evidence, judgment was entered in favor of Liebsack. Specifically, the trial court found that the evidence failed to prove that the corporation was the mere alter ego of the defendant Liebsack or that he had practiced fraud against the plaintiff. ServiceMaster's subsequent motion for a new trial was overruled. The plaintiff has appealed.

On appeal ServiceMaster asserts that the trial court erred only in its determination that the evidence was insufficient to support a finding of fraud on the part of Liebsack and therefore should have pierced the corporate veil.

Our review of the trial court's refusal to pierce the corporate veil is de novo on the record. *Slusarski v. American Confinement Sys.*, 218 Neb. 576, 357 N.W.2d 450 (1984); *Nebraska Engineering Co. v. Gerstner*, 212 Neb. 440, 323 N.W.2d 84 (1982). We must reach "an independent conclusion without reference to the findings of the District Court." *Id.* at 442-43, 323 N.W.2d at 86. Nevertheless,

"when the evidence on material questions of fact is in irreconcilable conflict, the court will, in determining the weight of the evidence, consider the fact that the trial court observed the witnesses and their manner of testifying and must have accepted one version of the facts rather than the opposite."

*Id.* at 443, 323 N.W.2d at 86 (quoting *Tilden v. Beckmann*, 203 Neb. 293, 278 N.W.2d 581 (1979)).

Generally, a corporation is viewed as a complete and separate legal entity from its shareholders and officers, who are not, as a rule, liable for the debts and obligations of the corporation. *Slusarski v. American Confinement Sys., supra.* This rule is

subject to exception in that " 'when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons.' " *Massachusetts Bonding & Ins. Co. v. Master Laboratories*, 143 Neb. 617, 627, 10 N.W.2d 501, 506 (1943) (quoting *United States v. Milwaukee Refrigerator Transit Co.*, 142 F. 247 (1905)). See, also, *Slusarski v. American Confinement Sys., supra; George v. Board of Education*, 210 Neb. 127, 313 N.W.2d 259 (1981); *Scribner Grain & Lumber Co. v. Wortman*, 204 Neb. 92, 281 N.W.2d 394 (1979). We have held that "where fraud is committed by a corporation it is time to disregard the corporate fiction and hold the persons responsible therefor in their individual capacities." *Fowler v. Elm Creek State Bank*, 198 Neb. 631, 639, 254 N.W.2d 415, 419 (1977); *Ashby v. Peters*, 128 Neb. 338, 258 N.W. 639 (1935).

To sustain a cause of action for fraudulent representation, a plaintiff must show (1) that a representation was made, (2) that the representation was false, (3) that, when made, the representation was known to be false, or made recklessly without knowledge of its truth and as a positive assertion, (4) that it was made with the intention that the plaintiff should rely upon it, (5) that the plaintiff reasonably did so rely, and (6) that he or she suffered damage as a result. *Gitschel v. Sauer*, 212 Neb. 454, 323 N.W.2d 93 (1982). See, also, *Mueller v. Union Pacific Railroad*, 220 Neb. 742, 371 N.W.2d 732 (1985); *Cummings v. Curtiss*, 219 Neb. 106, 361 N.W.2d 508 (1985); *Havelock Bank v. Woods*, 219 Neb. 57, 361 N.W.2d 197 (1985); *Ames Bank v. Hahn*, 205 Neb. 353, 287 N.W.2d 687 (1980).

Fraud is not presumed and must be proven by clear and convincing evidence. *Havelock Bank v. Woods, supra; Workman v. Workman*, 174 Neb. 471, 118 N.W.2d 764 (1962); *Rettinger v. Pierpont*, 145 Neb. 161, 15 N.W.2d 393 (1944).

While direct evidence is not always essential to this proof, inferences and presumptions of fraud drawn from circumstantial evidence " 'must not be guess work or conjecture but must be rational and logical deductions from the facts and circumstances from which they are inferred. . . .' " *Workman v. Workman, supra* at 497, 118 N.W.2d at 780. What constitutes fraud is a question of fact in each case. *Workman v.*

*Workman, supra.*

Circumstantial evidence alone is not sufficient to sustain a finding of fraud unless the circumstances " 'are of such a nature and so related to each other that the conclusion reached is the only one that can fairly and reasonably be drawn therefrom.' " *Rettinger v. Pierpont, supra* at 196, 15 N.W.2d at 411.

ServiceMaster contends that there was sufficient evidence to show that Liebsack made fraudulent representations in submitting J.R.L.'s monthly fee reports.

Several of the essential elements of fraud are established in the record. The monthly fee reports were signed by Liebsack and sent to ServiceMaster. By stipulation of the parties it is clear that the fee reports underreported revenues attributable to the ServiceMaster license by $400,000. Liebsack understood that ServiceMaster was entitled to 10 percent of the gross revenues set forth in the reports, which evidences an intent that ServiceMaster rely on the reports. Also, it is apparent from the stipulation of the parties that ServiceMaster relied on the reports to its detriment in the amount of $40,000.

The principal issue is whether the evidence was sufficient to show that Liebsack submitted the monthly fee reports knowing that the representations therein were false, or recklessly signed and submitted the reports without knowledge as to the truth of those representations. Because there was no direct evidence on this issue, the question is whether the circumstances shown were such that the only conclusion to be reasonably drawn therefrom is fraud on Liebsack's part. *Rettinger v. Pierpont, supra.*

Liebsack was the first president of J.R.L. Enterprises after its articles of incorporation were filed on November 3, 1978. The evidence is in conflict regarding whether Liebsack was then the sole shareholder. Nevertheless, additional shares were issued on March 30, 1979, with Liebsack holding 34 percent of the outstanding shares. In connection with this new issue of stock, several other business ventures were merged into J.R.L. Enterprises, and Richard Bossow, one of the new shareholders, was elected president of the corporation. On December 5, 1979, Bossow resigned as president and as a director. Liebsack testified that despite indications to the contrary in the corporate

minutes, he was not elected president of J.R.L. Enterprises at that point nor at any time subsequent thereto. Instead, the testimony is that John's brother, William Liebsack, was elected president on that date. Bossow's stock in J.R.L. was also repurchased and canceled, leaving John Liebsack holding 47 percent of the corporation's outstanding shares.

The corporate minute book indicates that John Liebsack was J.R.L.'s sole director after December 5, 1979. Additionally, following Bossow's departure, John Liebsack held primary responsibility for the corporation's bookkeeping, accounting, and management.

The license agreement was executed by John Liebsack as president of J.R.L. Enterprises in August of 1978 in conjunction with the purchase of the ServiceMaster cleaning operation from Gary Adams. The license agreement was executed by ServiceMaster on July 23, 1979.

While there is a conflict in the evidence regarding whether Liebsack was the sole investor in J.R.L. Enterprises at its corporate inception, it is clear that he held sole responsibility for the accounting and overall management of the company following Richard Bossow's resignation in December of 1979.

Liebsack testified that he prepared *some* and signed all of the ServiceMaster monthly fee reports. Gary Adams, who sold the ServiceMaster license agreement to J.R.L. in August of 1978, began employment with J.R.L. in February of 1979 as manager of the ServiceMaster operation, but was not responsible for submitting the monthly fee reports. Adams testified that the president of the corporation was responsible for that task, and although he was not certain who held that office, he thought that Liebsack had submitted the reports. In preparing the reports, Liebsack testified that he identified the revenues attributable to the ServiceMaster operation by reviewing "folders that were put into the [file] bin that we had collected money on."

The record shows that Liebsack obtained an undergraduate degree in business administration with an emphasis on accounting. Subsequent to graduation, he was employed as an auditor by a local bank for 3 years. He failed the C.P.A. exam in his only attempt to take it. J.R.L. carried on several business

enterprises in addition to the ServiceMaster operation, including a lawn business, a garden store, snow removal, a salvage operation, and carpet sales. The revenues from each of these operations were deposited into a single bank account.

Under the ServiceMaster license agreement, ServiceMaster was entitled to audit J.R.L.'s corporate records. Specifically, the agreement provided:

> Licensee shall keep and preserve full and complete accounting records of income in accordance with generally accepted accounting principles applied on a consistent basis. The accounts, books, records and tax returns of Licensee, (so far as the same pertain to the business of Licensee under the provisions of this Agreement) shall be open to the inspection, examination and/or audit by ServiceMaster . . . at all reasonable times.

In March of 1980 ServiceMaster audited J.R.L. to determine if the "feeable" revenue reported could be substantiated. Glenn Brownewell, the ServiceMaster agent who performed the audit, testified that because he found large disparities between the revenues reported in J.R.L.'s overall financial statements and that reported to ServiceMaster, he concluded that he had not been given all the records necessary to accurately audit the company. When Liebsack was asked to provide more information, he responded that the company kept no sales or scheduling journals, that the relevant tax returns had not yet been prepared, and that invoices which should have been attached to deposit slips were either lost or nonexistent.

Liebsack refused to make all of J.R.L.'s deposit slips available, stating that he did not feel it was in his best interests to do so. There was a dispute at this point as to whether ServiceMaster was entitled to fees from J.R.L.'s lawn operation. Liebsack believed Brownewell was only entitled to review ServiceMaster records. As a result of the audit, Brownewell concluded that the records supplied by J.R.L. "equaled" the monthly reports sent to ServiceMaster. He testified that he was unable to reach a judgment regarding the accuracy of the J.R.L. records overall because he was not allowed to see much of what he deemed to be necessary materials.

Liebsack testified that J.R.L.'s recordkeeping was probably not in accord with generally accepted accounting principles. Brownewell, on the other hand, acknowledged that sales and scheduling journals were not required to be kept by ServiceMaster licensees. Testimony by J.R.L.'s outside accountant indicates that the company's tax returns had not in fact been prepared for the relevant period at the time of the audit.

In 1982 ServiceMaster commenced this action to obtain an accounting of the amounts due under the license agreement. Pursuant to a discovery agreement, J.R.L. agreed to provide ServiceMaster with all of the financial records pertinent to an audit of the ServiceMaster franchise.

A second audit was performed in May of 1982. ServiceMaster was allowed to review invoices from J.R.L.'s LawnMaster and ServiceMaster operations. ServiceMaster's auditor concluded that there were $530,000 worth of deposits in the relevant account for which invoices were not available. As in the first audit, the ServiceMaster invoices which were made available matched the amounts represented in the monthly fee reports.

Linda Jones, a J.R.L. employee and shareholder, testified that in preparation for this audit and at John Liebsack's request, she pulled the ServiceMaster files which matched the fee reports. Following the service of summons on her husband, another J.R.L. stockholder, Jones went back and discovered that certain ServiceMaster invoices reflecting unreported revenues in the amount of $200,000 to $300,000 had been left out of the audit. She did not specifically recall thinking that she was leaving files which should have been pulled at the time of the original search. No one had instructed her not to pull those files.

Jones informed Liebsack of her findings upon discovery of the excluded invoices. These invoices were then organized and delivered to ServiceMaster's lawyers at the July 1983 deposition of Liebsack.

Liebsack's salary was increased from $16,000 in 1979 to $24,000 in 1980. He acknowledged that J.R.L. did not show a profit during the years 1979 to 1982. In contrast to his

deposition testimony, Liebsack testified that the company did have a positive cash-flow at times during that period. On cross-examination Liebsack explained that he had done some investigation in preparation for trial which indicated that his deposition answers regarding cash-flow were incorrect. J.R.L.'s outside accountant testified that the officers' salaries, for the years he prepared the company's tax returns, remained relatively constant, with some annual raises which were not out of line or excessive.

Liebsack acknowledged that he signed all of the monthly fee reports sent to ServiceMaster after reviewing them, and was satisfied that they were accurate.

The circumstantial evidence in the record is not so related that the only conclusion to be reasonably drawn from it is an inference of fraud by Liebsack. Although Liebsack signed the reports, he did not prepare them all, and there is no evidence that he directed the reports reflect anything other than a correct statement of sales. The trial court which heard the testimony and observed the witnesses firsthand considered the conflict between the inferences of fraud urged by ServiceMaster, Liebsack's testimony that he was satisfied that the fee reports were accurate, and Linda Jones' testimony that she did not inform Liebsack of the unreported ServiceMaster files until after the 1982 audit. The fact that the trial court resolved this conflict in Liebsack's favor is of some significance. As we view the record, the evidence was not clear and convincing that Liebsack submitted the reports knowing the representations to be false or that he acted recklessly without knowledge as to the truth of the representations.

While Liebsack's accounting practices and actions during the two ServiceMaster audits were not beyond reproach, the evidence fails to show that Liebsack actively practiced fraud upon ServiceMaster. See *Slusarski v. American Confinement Sys.*, 218 Neb. 576, 357 N.W.2d 450 (1984).

The judgment of the district court is affirmed.

AFFIRMED.

KRIVOSHA, C.J., concurring in the result.

For reasons more specifically set out in my separate concurrences in *Anderson v. Farm Bureau Ins. Co.*, 219 Neb. 1,

360 N.W.2d 488 (1985), and *In re Estate of Price, ante* p. 12, 388 N.W.2d 72 (1986), I concur in the result reached in this case.

SHANAHAN, J., joins in this concurrence.