FORKER SOLAR, INC., A PENNSYLVANIA CORPORATION, APPELLEE, V. JOHN L. KNOBLAUCH ET AL., APPELLANTS.

396 N.W.2d 273

Filed November 21, 1986.   No. 85-468.

David L. Herzog, P.C., for appellant Knoblauch.

J. Russell Derr of Erickson & Sederstrom, P.C., for appellants Putnam and Solar Marketing Company.

John D. Hartigan, Jr., of Kennedy, Holland, DeLacy & Svoboda, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

BOSLAUGH, J.

This case arose out of a controversy concerning a "Distributor Agreement" between the plaintiff, Forker Solar, Inc., and the defendant Solar Marketing Company (SMC). Both of these parties are corporations.

In 1977 Henry P. Forker IV, a resident of Pennsylvania, became interested in solar heating devices that were being manufactured by Solar, Inc. Forker came to Nebraska to investigate the product, which was known as the "Solar-Aire" System, and to meet the principals involved in the company. When he found he was unable to purchase stock in the manufacturing company, he decided to obtain a franchise to

distribute the equipment.

SMC is a corporation which was organized by the defendants John L. Knoblauch and James Putnam early in 1977 to handle the sales and distribution of the equipment. On April 8, 1977, SMC entered into an agreement with Solar, Inc., of Mead, Nebraska, to market the "Solar-Aire" System. A short time later, Knoblauch became a director of Solar, Inc. Forker met and talked with Knoblauch and Putnam and was provided with literature and information concerning the "Solar-Aire" System. Forker then organized the plaintiff, Forker Solar, Inc., for the purpose of distributing the equipment under a franchise agreement.

On November 17, 1977, the plaintiff and Solar Marketing Company entered into the distributor agreement which authorized the plaintiff to sell solar products in a described area in Pennsylvania and Ohio for a period of 2 years. The agreement was signed on behalf of Solar Marketing Company by Knoblauch, as president. Under the agreement the plaintiff was obligated to pay a licensing fee of $42,617, purchase a $15,000 inventory of solar products, establish a central warehouse, and establish and maintain retail dealerships.

On November 23, 1977, Knoblauch sent Forker a letter of welcome to the company, which predicted a great future for the new joint enterprise. On December 7, 1977, the plaintiff paid $28,808.50, one-half of the balance due on the agreement, to SMC. Six weeks later, on January 19, 1978, Knoblauch resigned from his position as president and left SMC to go to Valmont Industries. Forker was notified of Knoblauch's departure by a letter dated January 25, 1978, from Leo Arens, the new vice president and treasurer of SMC.

In January 1978 Forker attended a meeting in Columbus, Ohio, which was a training session concerning the equipment, its installation, operation, etc. The defendant Knoblauch was one of the lecturers at this meeting.

Forker sent the final payment due under the agreement to SMC in March or April 1978. Putnam was then president of SMC. Solar, Inc., terminated its agreement to supply products to SMC on April 7, 1978. Later that year, Forker and Putnam signed a second distributorship agreement.

The second agreement did not expressly supersede the first, and it contained several provisions which differed from the first. It granted additional territory to the plaintiff, the 2-year licensing fee was reduced to $1, the minimum inventory requirement was raised to $18,500, and SMC agreed to sell the plaintiff any solar products, rather than "Solar-Aire" products exclusively. Additionally, the agreement provided that at the time of its execution SMC owed Forker $18,500 in inventory.

Forker testified that the plaintiff entered into the second agreement because he thought he was

in a position to press Putnam for more territory, just simply because he [Putnam] couldn't meet his demands. . . . [H]e was willing to give up that additional territory for a dollar . . . . And we took it, ah, thinking that we might as well get something and hopefully . . . he'd get healthy and we'd get healthy.

Forker testified that he viewed the second agreement as an extension of the first one. SMC did not "get healthy," but went out of business. Putnam notified Forker on January 24, 1979, that SMC was no longer in business.

This action was commenced against Knoblauch, Putnam, and SMC on June 7, 1979, seeking recovery on theories of securities violations, breach of contract, fraud, and breach of fiduciary duty. An amended petition was filed June 5, 1984, which alleged only that misrepresentations made by the defendants induced Forker to enter into the first distributorship agreement and caused him to suffer damages. Forker alleged special damages consisting of $42,617, the 2-year license fee; $15,000, representing the purchase price of the inventory required by the agreement; and $15,000 as costs of organizing and promoting the dealership.

Trial began April 11, 1985. Knoblauch was present at the trial and represented by counsel, but Putnam and SMC were neither present nor represented. The jury returned a verdict against Knoblauch in the amount of $67,616. The trial court granted the plaintiff a default judgment against Putnam and SMC on May 29, 1985, for the same amount. This appeal followed.

Knoblauch alleges 13 assignments of error which essentially contend the judgment is not supported by the evidence and is

contrary to law. Putnam and SMC contend the default judgment should be vacated and that the cause of action for fraud and deceit alleged in the amended petition was barred by the statute of limitations.

The statute of limitations contention is also made by Knoblauch. Neb. Rev. Stat. § 25-207(4) (Reissue 1985) requires all actions sounding in fraud to be brought within 4 years of the discovery of the fraud. Knoblauch and Putnam contend the cause of action for fraud and deceit is barred because the original petition alleged fraud only against SMC.

This contention is not supported by the facts of the case or the law. In the original petition four causes of action were alleged. The first cause of action alleged all of the parties had violated federal and state securities laws. The second cause of action alleged fraud against SMC, and alleged that Knoblauch and Putnam had made misrepresentations to Forker concerning SMC and the solar products it distributed. The third cause of action alleged SMC had breached its contract with the plaintiff. The fourth cause of action alleged that Knoblauch and Putnam exercised such control over SMC that the corporation had no separate existence, that the two men used the corporation to perpetrate the wrongs alleged in the first cause of action, and that this control and breach of statutory duty caused the plaintiff's loss. In addition, the petition contained allegations concerning SMC's proposed network of franchised dealers, SMC's alleged exclusive rights to market certain solar products, and representations made by Knoblauch and Putnam which had induced the plaintiff to enter into the agreement.

The amended petition did not plead the securities violations or breach of contract. Instead, the amended petition alleged solely that misrepresentations made by Knoblauch and Putnam, who purportedly acted "in the guise of Solar Marketing Company," induced the plaintiff to rely on their representations and enter into the first distributorship agreement, which caused its loss. Many of the allegations contained in the original petition were reiterated in the amended petition: the initial meeting of the parties, SMC's plans to build a nationwide franchising network, and the agreement itself.

The misrepresentations attributed to Knoblauch and Putnam in the amended petition were almost identical to those alleged in the original petition, and both petitions alleged these misrepresentations induced the plaintiff to enter into the first agreement.

A careful reading of the two petitions shows that both allege the same operative facts and seek recovery for the same injury. The original petition sounded in fraud and breach of contract, while the amended petition is limited to fraud. The plaintiff modified its theory of recovery in the amended petition but did not state a new and independent cause of action.

This court has consistently held that "[a] cause of action pleaded by amendment ordinarily relates back to the original pleading provided that claimant seeks recovery on the same general set of facts." *Abbott v. Abbott*, 185 Neb. 177, 181, 174 N.W.2d 335, 338 (1970). See, also, *Knoell Constr. Co., Inc. v. Hanson*, 210 Neb. 628, 316 N.W.2d 321 (1982). The theory of recovery is not itself a cause of action; therefore, if the general facts upon which the right to recover is based are the same, the amendment relates back. *Kohler v. Ford Motor Co.*, 187 Neb. 428, 191 N.W.2d 601 (1971).

Appellants Putnam and SMC next assign as error the trial court's failure to vacate the default judgment and grant them leave to file an amended answer to the amended petition. It is their position that the default judgment was not properly entered against them because the notice requirements of rule 12 of the Rules of Practice for the Fourth Judicial District (rev. 1985) were not followed, and because the interests of justice would require vacation.

This argument is not persuasive. Rule 12A applies to default judgments entered before trial upon the failure of a defendant to plead or appear. Rule 12B requires that a party who has appeared but later defaults must be given notice, as in other cases, of a hearing upon a motion for default judgment, or the assessment of damages, or the taking of proofs in cases. Appellants contend that rule 12B required the trial court to notify them of the hearing on the plaintiff's motion for default judgment. The trial court held rule 12B was not applicable to this case but applied only to hearings on default motions prior

to trial.

Our reading of the rule confirms the trial court's construction. Under rule 12B a defendant must receive notice of a hearing on a default motion prior to trial. In this case the default judgment was entered after trial on the merits. Putnam received notice of the trial and the hearing on the motion for a default judgment. His failure to appear and defend was a lack of due diligence and does not constitute grounds for the vacation of the default judgment.

Nebraska law has long recognized the need to set aside default judgments to ensure that litigants have a fair opportunity to present their contentions in court. See, e.g., *Urwin v. Dickerson*, 185 Neb. 86, 173 N.W.2d 874 (1970); *Lacey v. Citizens Lumber & Supply Co.*, 124 Neb. 813, 248 N.W. 378 (1933); *Lichtenberger v. Worm*, 41 Neb. 856, 60 N.W. 93 (1894). A countervailing consideration must be balanced against this need: the duty of the courts to prevent unnecessary delays in the prosecution of actions and to guard against dilatory and frivolous proceedings. *Urwin, supra.*

Factors to be considered in determining whether a trial court abused its discretion in rendering a default judgment include the promptness of the motion to vacate, the negligence or want of diligence of the party moving to vacate, and the avoidance of unnecessary delays and frivolous proceedings. *Michaelis v. Michaelis*, 187 Neb. 350, 190 N.W.2d 783 (1971); *Commercial Sav. & Loan Assn. v. Holly Development, Inc.*, 182 Neb. 335, 154 N.W.2d 510 (1967).

In *Commercial Sav. & Loan Assn., supra* at 339-40, 154 N.W.2d at 513, this court stated, " '[T]he general rule is that one who seeks to set aside a default judgment against him must show that neither he nor his attorney was negligent in failing to appear and defend a suit. . . .' " Similarly, in the earlier case of *Cleland v. Hamilton Loan & Trust Co.*, 55 Neb. 13, 14-15, 75 N.W. 239, 240 (1898), in denying a motion to vacate a default judgment obtained by the use of a forged signature, we held,

It is an inflexible rule that a party seeking relief in equity from a judgment taken against him by default must exhibit a defense to the action and also show that such judgment is the result of fraud, accident, or mistake,

unmixed with fault or negligence on his part. A judgment will not be set aside on the application of a party who has, by his own laches, failed to avail himself of an opportunity to defend. This salutary rule rests on principle and authority, and its rigid enforcement is necessary for the repose of society, by preventing litigation from becoming interminable.

More recently, in *Anderson Mktg. Associates v. Roberts*, 215 Neb. 670, 340 N.W.2d 384 (1983), this court reversed the trial court's vacation of a default judgment, on the grounds the defendant failed to duly defend the action. The record in that case clearly disclosed the defendant's lack of due diligence. The default judgment had been entered after a 17-month period, during which the defendant had filed only one minor pleading.

The facts of this case are similar to *Anderson*, and clearly evidence Putnam's and SMC's lack of due diligence. Putnam had notice of the trial and the default hearing. Leave to amend the answer was sought 1 year after the amended petition was filed, and almost 6 weeks after trial. The record does not show the trial court abused its discretion in denying the motion to vacate the default judgment, and the default judgment against Putnam and SMC is affirmed.

Knoblauch contends that the plaintiff is not the real party in interest and that the plaintiff's corporate existence was not proven at trial. Both contentions are without merit. The record shows that Forker entered into both distributorship agreements as president of the plaintiff. Forker testified as to his title, his duties, and the capitalization of the plaintiff. He also testified as to some of the expenses the company incurred as a result of the agreements. The only logical inference to be drawn from the record is that Knoblauch recognized the plaintiff as a corporation when he signed the first agreement.

A person who contracts with a corporation is estopped from later denying its corporate existence. *Retail Merchants Service v. Bauer & Co.*, 125 Neb. 61, 248 N.W. 813 (1933); *American Gas Construction Co. v. Lisco*, 122 Neb. 607, 241 N.W. 89 (1932). Knoblauch is therefore estopped from questioning the plaintiff's corporate existence.

Further, Knoblauch filed a general denial to the original

pleading and did not specifically deny the plaintiff's corporate existence. A general denial does not put corporate character in issue. *Davis v. Nebraska Nat. Bank of Omaha*, 51 Neb. 401, 70 N.W. 963 (1897); *Dietrichs v. L. & N. W. R. R.*, 13 Neb. 43, 13 N.W. 13 (1882); *National Life Ins. Co. v. Robinson*, 8 Neb. 452, 1 N.W. 124 (1879).

Knoblauch next asserts that the plaintiff failed to present a prima facie case of misrepresentation against him. He contends the record does not show that he made any claims, assurances, or representations to the plaintiff and Forker. Knoblauch further argues that Putnam's deposition, when read into evidence, so confused the jury that Putnam's statements were improperly attributed to him. Knoblauch also contends that any representations he made did not relate to a present or preexisting fact. Finally, Knoblauch contends that the plaintiff's recovery is barred for two reasons: First, because if the plaintiff had properly investigated before investing, it could have prevented the loss; and second, because after the first payment was made, the plaintiff was on notice of the facts which now form the basis of the action, and acted in disregard of those facts.

A jury verdict will not be disturbed on appeal "unless it is clearly erroneous, against the preponderance of the evidence, and so clearly contrary to the findings that it is the duty of the reviewing court to correct it." *Maricle v. Spiegel*, 213 Neb. 223, 232-33, 329 N.W.2d 80, 87 (1983). See, also, *Krug v. Laughlin*, 208 Neb. 367, 303 N.W.2d 311 (1981); *Lintner v. Roos*, 202 Neb. 476, 276 N.W.2d 93 (1979).

A jury verdict will be considered sufficient if the record discloses any competent evidence which supports a finding for the successful party. *Mennonite Deaconess Home & Hosp. v. Gates Eng'g Co.*, 219 Neb. 303, 363 N.W.2d 155 (1985). Conflicts in the evidence and the credibility of witnesses are for the jury's determination, not the court on review. *Id*. See, also, *Kniesche v. Thos*, 203 Neb. 852, 280 N.W.2d 907 (1979); *Hawkins Constr. Co. v. Matthews Co., Inc.*, 190 Neb. 546, 209 N.W.2d 643 (1973), *disapproved on other grounds* 213 Neb. 782, 332 N.W.2d 39 (1983).

All inferences which may be drawn from the evidence must

be drawn in favor of the prevailing party. *Anderson v. Farm Bureau Ins. Co.*, 219 Neb. 1, 360 N.W.2d 488 (1985); *Duncza v. Gottschalk*, 218 Neb. 879, 359 N.W.2d 813 (1984); *Farm Bureau Life Ins. Co. v. Luebbe*, 218 Neb. 694, 358 N.W.2d 754 (1984). Our review is limited to determining whether the record evinces sufficient facts to support the verdict.

To maintain an action for damages for false representations, the plaintiff must allege and prove, by a preponderance of evidence, the following elements: (1) that a representation was made; (2) that the representation was false; (3) that the representation was known to be false when made, or was made recklessly without knowledge of its truth and as a positive assertion; (4) that it was made with the intention that the plaintiff should rely on it; (5) that the plaintiff reasonably did so rely; and (6) that the plaintiff suffered damage as a result. *Nielsen v. Adams*, 223 Neb. 262, 388 N.W.2d 840 (1986).

The amended petition alleged all six elements of misrepresentation. The specific misrepresentations alleged included (1) that SMC had the exclusive right to distribute the "Solar-Aire" System; (2) that the "Solar-Aire" System was currently manufactured and sold for use to consumers by various distributors and dealers in SMC's marketing network; (3) that the "Solar-Aire" System had been laboratory and field tested, and its scientific viability established; (4) that no manufacturing or installation problems were being encountered; and (5) that SMC was ready to fill all orders for the system which Forker might place.

At trial Knoblauch testified that as a director of Solar, Inc., he had attended meetings throughout the fall of 1977 at which the products' quality, company finances, and production problems were discussed. He also admitted that he knew about the financial condition of Solar, Inc., prior to his resignation. Additionally, he admitted knowing about the leakage problem and having discussed it with Forker. He denied having knowledge of the results of certain laboratory tests, however, and stated that in April of 1977 SMC had a warehouse full of inventory, as well as a large number of distributors.

Knoblauch contends this testimony clearly shows that he made no misrepresentations to Forker which would support the

jury verdict. In addition, he testified that, before resigning from SMC, he called Forker and warned him to investigate further before sending the balance due on the contract. He did not follow that conversation with a letter or warn the rest of the distributors. Forker denies that such a conversation took place.

In a fraud case direct evidence is not essential, but proof of fraud drawn from circumstantial evidence must not be guesswork or conjecture, but must be rational and logical deductions from the facts and circumstances from which they are inferred. *ServiceMaster Indus. v. J.R.L. Enterprises*, 223 Neb. 39, 388 N.W.2d 83 (1986). See, also, *Workman v. Workman*, 174 Neb. 471, 118 N.W.2d 764 (1962). The circumstances must be " ' "of such a nature and so related to each other that the conclusion reached is the only one that can fairly and reasonably be drawn therefrom." ' " *ServiceMaster Indus., supra* at 44, 388 N.W.2d at 86 (citing *Rettinger v. Pierpont*, 145 Neb. 161, 15 N.W.2d 393 (1944)).

Several elements of fraud are clearly established in this record: Knoblauch's knowledge of the poor financial condition of the parent company, the attendant production problems, and the dubious future of SMC at the time of his resignation. The jury could find that Knoblauch knew of these problems when the first agreement was negotiated, when the first payment was received, and at the time of his resignation. There was conflicting evidence as to whether Knoblauch actually warned Forker of these problems. The jury decided that issue against Knoblauch. The evidence was sufficient for the jury to make that finding. *Kniesche v. Thos*, 203 Neb. 852, 280 N.W.2d 907 (1979).

Knoblauch next argues any liability he may have had to the plaintiff was eliminated by the second agreement. This argument is not persuasive. The plaintiff sustained its loss when Knoblauch failed to warn it of the inevitable failure of Solar, Inc., and SMC. The second agreement was viewed by Forker and Putnam as a continuation of the first agreement, and it did not increase the plaintiff's loss.

Similarly, Knoblauch's arguments that the plaintiff's recovery is barred by its failure to investigate and its continued participation with SMC are without merit.

Nebraska law imposes a duty of ordinary prudence. *Bank of Valley v. Mattson*, 215 Neb. 596, 339 N.W.2d 923 (1983). A person is justified in relying upon a representation made to him as a positive statement of fact, when an investigation would be required to ascertain its falsity. *Id*. See, also, *Fricke v. Hart*, 206 Neb. 590, 294 N.W.2d 737 (1980); *English v. Bruin Engineering, Inc.*, 201 Neb. 791, 272 N.W.2d 753 (1978).

In this case Forker was justified in relying on the statements made during the contract negotiations, as well as the provisions of the contract itself. To discover the falsity of those representations, Forker would have had to make an independent investigation of the financial security and manufacturing capability of the parent company, Solar, Inc., as well as independent laboratory and field tests of the product. In a similar case, *Little v. Gillette*, 218 Neb. 271, 354 N.W.2d 147 (1984), the plaintiff sued two realtors for misrepresenting the economic viability of a business she had purchased from them. At trial there was evidence the realtors knew the previous operation was a financial disaster, yet assured the plaintiff of the potential profits in the business. We found such ·evidence sufficient to support a verdict for the plaintiff. The defendants' argument the plaintiff should have investigated further was found not to be convincing. Since an independent investigation of the facts would have been required, the plaintiff was entitled to rely on the defendants' representations.

The final issue is whether the jury verdict is excessive. Forker alleged special damages in the amount of $72,617. The jury awarded damages in the amount of $67,616. At trial the plaintiff presented evidence of the two payments to SMC in the amount of $57,617, as required by the first agreement. The only additional evidence of damage was Forker's testimony that his corporation was capitalized by the infusion of $10,000 in cash, and by his testimony that his business had the "normal overhead of a small business."

In an action for fraud a party may recover such damages as will compensate him for the loss or injury actually caused by the fraud and place the defrauded party in the same position as he would have been in had the fraud not occurred. *Alliance Nat. Bank v. State Surety Co.*, 223 Neb. 403, 390 N.W.2d 487 (1986).

See, also, *Harsche v. Czyz*, 157 Neb. 699, 61 N.W.2d 265 (1953). One who enters into an agreement by virtue of a material misrepresentation may either affirm the agreement and sue for damages or disaffirm the agreement and sue to be reinstated to the position which existed before entering into the contract. *Tobin v. Flynn & Larsen Implement Co.*, 220 Neb. 259, 369 N.W.2d 96 (1985). Here, the plaintiff chose to affirm the contract and sue for damages.

The plaintiff's evidence at trial established actual damages in the amount of $57,617. This figure represents the amount paid on the first agreement, for which the plaintiff did not receive the agreed-upon consideration. Since no other sufficient proof of damages was presented, the verdict for $67,617, as well as the default judgment for that amount, is excessive. We conclude the record will not support an award in excess of $57,616, and a remittitur of $10,000 should be awarded.

The cause is remanded and the plaintiff shall have 10 days after the filing of the mandate of this court in the district court in which to file an acceptance of the remittitur. The judgment shall draw interest from the date the remittitur is accepted.

In the event the plaintiff fails to accept the remittitur, the defendants are granted a new trial as to the issue of damages only.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.