DENNIS D. SCHUELKE, APPELLANT AND CROSS-APPELLEE, V.
DAVID L. WILSON, APPELLEE AND CROSS-APPELLANT, AND
BUSINESS BROKERS OF YORK AND MAACO ENTERPRISES, INC.,
APPELLEES.
549 N.W.2d 176

Filed June 21, 1996.  No. S-93-1123.

Terry C. Dougherty, of Knudsen, Berkheimer, Richardson & Endacott, and Terry K. Barber for appellant.

Mark J. Peterson, of Erickson & Sederstrom, P.C., for appellee Wilson.

WHITE, C.J., CAPORALE, LANPHIER, WRIGHT, CONNOLLY, and GERRARD, JJ.

WHITE, C.J.

This action was brought by Dennis D. Schuelke, seeking rescission of an agreement with David L. Wilson for the purchase of an auto paint and body repair franchise in Lincoln, Nebraska. Schuelke pleaded theories of fraudulent concealment and fraudulent misrepresentation. Wilson filed a counterclaim, requesting payment of two promissory notes executed by Schuelke. The district court ordered rescission. The court, however, held that no further transfers between Schuelke and Wilson were required to return the parties to the status quo and entered an order accordingly. Schuelke appeals; Wilson cross-appeals.

Schuelke assigns two errors: (1) The trial court erred in determining the value of the franchise from a document that was offered into evidence allegedly only for the purpose of proving that Wilson had misrepresented information to Schuelke, and (2) the trial court, after determining that Schuelke was entitled to rescission, erred in holding that Schuelke's petition should be dismissed without ordering further transfers between the parties.

In his cross-appeal, Wilson contends that the district court erred in granting rescission. Because we find that Schuelke was not entitled to rescission, we reverse, and remand with directions.

In 1980, Wilson purchased an auto paint and body repair franchise in Lincoln called Maaco Auto Painting and Bodyworks (Maaco). He owned the franchise until selling it to Schuelke in 1989. Until December 1988, the actual ownership of the Maaco franchise was listed in the name of Dakin, Inc., a corporation in which Wilson was president, and he and his wife were the stockholders. The only asset held by Dakin was the Maaco business. Wilson also owned Darsco, Inc. At the time of the sale of the franchise, Darsco provided the management services for the Lincoln Maaco franchise and one

other Maaco franchise in Omaha, Nebraska, which Wilson owned.

In June 1989, Schuelke met with Lee Adams of Business Brokers Corporation to discuss possible investment options. Wilson, the owner of the Maaco franchise, had previously contracted with Business Brokers to sell the franchise. Adams discussed the possibility of Schuelke purchasing the Maaco franchise. Schuelke painted automobiles as a hobby and intended to manage and operate the Maaco business himself.

After meeting with Adams, Schuelke then met with Wilson to discuss purchasing the franchise. The parties held several meetings prior to the purchase. Various matters were discussed at these meetings, including profitability, the quality of the material used and work performed, the building lease where the business was located, and advertising materials and techniques.

Adams and Wilson represented that Maaco would generate approximately $400,000 per year in gross sales and produce a profit margin of 25 percent. Wilson provided Schuelke with a document containing Maaco's statements of profit for the years 1986 and 1987. The statements of profit were broken down into three areas: sales, cost of sales, and expenses. These statements of profit listed total sales at $420,360.30 for 1986 and $396,147.39 for 1987. They listed earnings before income taxes at $116,688.31 for 1986 and $102,029.95 for 1987.

Each statement of profit contained a footnote that stated, "The above expense figures have been adjusted to reflect an owner operated franchise." Several of the expense figures listed in the statements of profit were adjusted by Wilson. The adjustments were made from expenses listed on Dakin's tax returns for the corresponding years.

Wilson testified at trial that these adjustments were made to reflect expenses that would be incurred in an owner-operated franchise as opposed to an absentee-owner franchise. In his testimony, Wilson explained that he operated the franchise as an absentee-owner, employing managers to run the business. He further explained that some of the expenses would be eliminated or reduced if the business was operated as an owner-operated franchise.

At one of the meetings between Wilson and Schuelke, Wilson explained how he reached the adjusted figures listed under the expenses section of the statements of profit. Wilson testified that he provided Schuelke with the tax returns for the years 1985 through 1988 at this meeting. These tax returns contained the preadjusted figures regarding the expenses listed on the statements of profit. Wilson explained to Schuelke his reasons for making each adjustment and gave him copies of the statements of profit containing handwritten notations next to the expense column indicating the preadjusted amount which was derived from the tax returns.

Wilson further testified that he told Schuelke that these adjustments were approximations based on the history of the business. Wilson also testified that he consulted with the Lincoln Maaco's accountant, Ron Ferdig, when making the adjustments on the statements of profit. Wilson testified that because these expense figures were approximations, he recommended that Schuelke see an accountant or a lawyer to have them verified. Wilson also specifically provided Schuelke with Ferdig's name and telephone number so Schuelke could consult with Ferdig concerning these statements of profit.

In regard to the statements of profit, Schuelke testified that Wilson explained the adjustments item by item and further testified that he understood Wilson's representations of these adjustments. Schuelke also testified that he had ample opportunity to have the adjusted figures analyzed by an accountant, but chose not to do so.

In regard to the tax returns, Schuelke testified that these were provided to him with ample opportunity to review them before signing the final purchase agreement. Schuelke also testified that Wilson never avoided discussing with or explaining to Schuelke the figures that were listed on the statements of profit or the tax returns.

The most significant expense not appearing on the statements of profit was an expense characterized as an "administrative fee." This fee totaled $41,400 in 1986 and $55,200 in 1987. This fee was paid to Darsco, Wilson's other corporation, for administrative services provided by Darsco. A portion of this fee was then paid by Darsco to Wilson as an

employee in the form of wages. Wilson testified that he explained to Schuelke that this fee would no longer be paid to Darsco because Darsco would no longer be providing management services.

Wilson also eliminated a large portion of the salary expense. This expense was reduced by $19,415 for 1986 and $19,088 for 1987. Wilson testified that he told Schuelke this expense would be reduced because Schuelke was to manage the operation himself and would no longer need the manager employed by Wilson.

Other expenses that were not listed on the statements of profit were depreciation, bad debt expense, and interest expense. Expenses that were reduced but not eliminated on the statements of profit included insurance expenses, office expenses, professional fees, rent, repairs and maintenance, payroll, and license expenses. Last, some expenses were not adjusted, while others were increased from the actual amount that Wilson incurred.

Ferdig testified that he believed the differences between the statements of profit and the corporate tax returns were reasonable adjustments for operating the business under an owner-operator style of management.

Larry L. Lausten, a certified public accountant, testified at trial as an expert witness for Schuelke. Lausten testified as to the differences in the expenses listed between the tax returns and the statements of profit. After reviewing the tax returns and statements of profit, Lausten concluded that expenses were understated by $101,138 in 1986 and $92,629 in 1987. He testified that, in his opinion, some of these expenses should not have been reduced or eliminated.

Specifically, Lausten stated that he believed that the interest expense, the bad debt expense, and the administrative expense should not have been completely eliminated. He stated that because Schuelke was borrowing money to finance the franchise, an interest expense would be incurred. He also testified that because the operation had receivables, a bad debt expense would be incurred. Regarding the administrative fee, Lausten testified that he believed Schuelke would incur some of the same expenses that were included in the administrative fee

paid to Darsco. Lausten did not specifically state whether he believed it was improper for Wilson to reduce or eliminate any other expenses that were adjusted on the statements of profit.

In October 1989, Schuelke executed a final purchase agreement to purchase the Maaco business from Wilson. The agreement called for a purchase price of $250,000. Of this purchase price, Schuelke paid $140,000 in cash and executed two promissory notes in the total amount of $110,000 to satisfy the remainder. .

Schuelke began operating the franchise in the middle of October 1989. On November 22, Schuelke wrote a letter to Wilson stating that he was rescinding the agreement. In his letter, Schuelke stated that Wilson misrepresented, among other things, "the business expenses and weekly sales." In this letter, he offered to restore Wilson with the franchise and property in exchange for Wilson's returning Schuelke's original payment and canceling the notes Schuelke executed.

Schuelke initiated this action on January 12, 1990. Schuelke, in his prayer for relief, requested that the court grant rescission or, in the alternative, damages. Wilson filed a counterclaim, alleging that Schuelke defaulted under the promissory notes and seeking damages in the amount of the balance of the notes.

Schuelke continued operating the Maaco business until June 1990, at which point he closed and abandoned the business. Schuelke testified that at the time he closed the business, he left all of the equipment behind except for some paint. He also testified that Maaco Enterprises, Inc., terminated his franchise agreement after he closed and abandoned the business.

In the 35 weeks of the Lincoln Maaco's operation under Schuelke's ownership, the franchise generated $301,963 in gross sales. At trial, this figure was used to determine a projected sales figure for a 1-year period. Schuelke was projected to generate $448,644 in sales in his first year of operation. However, his weekly expenses and cost of goods were generally greater than his sales, and, for the most part, he operated at a loss. Schuelke generated a profit the first 3 weeks he operated the business. Thereafter, he mostly operated at a loss,

with intermittent weeks of profit. At the time of closing, Schuelke's operating losses totaled approximately $30,000.

At trial, the deposition of Fred McMullen, Maaco Enterprises, Inc.'s director of center openings and development, was admitted into evidence. He testified in his deposition as to both the operation of a Maaco franchise in general and as to Schuelke's management of the Lincoln Maaco.

McMullen testified as to the difficulties new owners encounter in operating a Maaco franchise and stated that it was typical for a new Maaco franchise owner to struggle financially in the first year of operation. He stated that new owners encounter variances week to week in the gross figures produced. McMullen also testified that Maaco operators incur cost control problems during the winter months because of a decrease in sales due to the holiday season and the weather.

McMullen received and reviewed "weekly summary business reports" from Schuelke which listed sales, cost of goods, and expenses. McMullen testified that he had several discussions with Schuelke throughout Schuelke's ownership of the franchise regarding Schuelke's productivity as reflected in the weekly reports. He testified that Schuelke's financial difficulty was typical of a new owner in his or her first year, especially when taking over the operation just prior to the winter months. McMullen also stated that he made recommendations to Schuelke several times throughout Schuelke's ownership concerning how to improve the financial status of the franchise. McMullen further testified that toward the end of Schuelke's operation of the franchise, Schuelke refused to operate the business according to McMullen's recommendations.

On October 8, 1993, the district court issued an order granting rescission of the purchase agreement. The district court based its decision to grant rescission on the theory of fraudulent misrepresentation, rather than fraudulent concealment. Specifically, the court concluded that the representations made regarding the difference in profitability between an owner-operated Maaco and a management-type enterprise were materially false. In this regard, the court stated:

> When the Lincoln Maaco was operated by Wilson, it was a management-type enterprise. Under [Schuelke], it

became an owner-operator business. The potential financial consequences of this distinction, at least as guessed by Wilson, are shown on Exhibit 76. Exhibit 76 shows the differences between the Statements of Profit for 1987 and 1986 and the respective federal tax forms and the reasons for the discrepancies. In addition, the Statements of Profit reflect that they are "adjusted to reflect an owner operated franchise." Prior to the closing, Wilson went over the figures on Exhibit 76 with [Schuelke] and told him that the adjustments were a "guesstimate." He recommended that [Schuelke] have the figures verified. Along with the Statements of Profit, [Schuelke] had the annual tax returns, which provided the historical documents prepared in accordance with generally acceptable accounting principles.

By couching his explanation for the differences shown on Exhibit 76 as "guesstimates," Wilson attempts to deflect any conclusion that [Schuelke] was justified in relying upon his representations. This attempt is not successful. Wilson made these representations to [Schuelke] knowing that [Schuelke] was relying upon them and upon Wilson's many years of experience in the Maaco business. Although the court does not find that Wilson made the representations falsely, it does find, by clear and convincing evidence, that he made representations concerning financial matters to [Schuelke] recklessly, without knowledge of their truth and as positive assertions; that Wilson intended [Schuelke] to rely on those financial representations; that [Schuelke] did rely thereon; that the representations were false; and that [Schuelke] suffered damages as a result thereof.

An action for rescission is equitable in nature and as such is reviewable by an appellate court de novo on the record. *Haumont v. Security State Bank*, 220 Neb. 809, 374 N.W.2d 2 (1985). In a de novo review, an appellate court reaches a conclusion independent of the trial court; however, where credible evidence is in conflict on a material issue of fact, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted

one version of the facts rather than another. *Eggers v. Rittscher*, 247 Neb. 648, 529 N.W.2d 741 (1995).

In order to maintain an action for fraudulent misrepresentation, a plaintiff must allege and prove the following elements: (1) that a representation was made; (2) that the representation was false; (3) that when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) that it was made with the intention that the plaintiff should rely upon it; (5) that the plaintiff reasonably did so rely; and (6) that he or she suffered damage as a result. *Gibb v. Citicorp Mortgage, Inc.*, 246 Neb. 355, 518 N.W.2d 910 (1994).

In a fraud case, direct evidence is not essential, but proof of fraud drawn from circumstantial evidence must not be guesswork or conjecture; such proof must be rational and logical deductions from the facts and circumstances from which they are inferred. *Forker Solar, Inc. v. Knoblauch*, 224 Neb. 143, 396 N.W.2d 273 (1986).

In a rescission case, the party alleging fraud must prove all elements by clear and convincing evidence. *Kracl v. Loseke*, 236 Neb. 290, 461 N.W.2d 67 (1990). After reviewing the record de novo, we find that Schuelke failed to prove all of the elements of fraudulent misrepresentation by clear and convincing evidence.

Specifically, Schuelke failed to prove by clear and convincing evidence that Wilson intended for Schuelke to rely on Wilson's representations regarding the profitability of the company when operated under an owner-operator type of management versus an absentee-owner type of management. Wilson made particular representations as to why he believed certain expenses would be reduced or eliminated under an owner-operator management style. Wilson, however, then specifically told Schuelke that the figures he stated were approximations that he established after discussing the matter with his accountant. Moreover, Wilson then recommended that Schuelke have these figures verified. These facts negate Wilson's intention that Schuelke rely upon his representations.

Moreover, we do not find that the record supports a finding that Schuelke acted reasonably in relying on these represen-

tations as to the profitability of the business under an owner-operator style of management.

It is true that a person is justified in relying upon a representation made to him as a positive statement of fact, when an investigation would be required to ascertain its falsity. *Forker Solar, Inc., supra.* Nebraska law, however, imposes a duty of ordinary prudence. *Id.* In regard to this duty, this court has stated that "[w]hile no action will lie where ordinary prudence would have prevented the deception, that rule is generally applied where the means of discovering the truth was in the hands of the party defrauded." *Omaha Nat. Bank v. Manufacturers Life Ins. Co.*, 213 Neb. 873, 883, 332 N.W.2d 196, 202 (1983).

Under the circumstances of this case, we find that Schuelke was not justified in relying on the representations set forth in the statements of profit or on Wilson's explanations regarding the adjustments he made as to expenses. Schuelke specifically testified that he was concerned about the differences between the expense figures listed in the tax returns and those listed in the statements of profit. Wilson, after explaining his adjustments to the expenses, recommended that Schuelke have the figures verified. Schuelke concedes that he had in his possession all the documents necessary to have the expense figures reviewed to ascertain their accuracy. Schuelke, however, took no further action in ascertaining the validity of these adjusted expense figures.

Under the circumstances of this case, Schuelke did not act in an ordinary and prudent manner in relying on the representations made by Wilson. The adjusted expenses listed in the statements of profit were substantially lower than those listed in the tax returns for the corresponding years. As Schuelke testified, this naturally concerned him. These concerns that Schuelke admitted he had regarding the adjusted expense figures, however, could not have been eliminated after discussing the adjustments with Wilson. Wilson, rather than attempting to assure Schuelke of the accuracy of his representations, told Schuelke that the adjustments were approximations and recommended that they be verified.

This court, in *Little v. Gillette*, 218 Neb. 271, 354 N.W.2d 147 (1984), addressed the same type of claim as made by Schuelke in the case at bar—alleged fraudulent misrepresentations by a vendor of a franchise. However, the vendor's conduct in *Little* was vastly different from Wilson's conduct in this case. In *Little*, the defendants continuously represented to the plaintiff that the franchise would generate a monthly profit of $10,000. The defendants also told the plaintiff that they would verify the financial figures regarding the estimated projected profit. The defendants, however, never verified these figures. Moreover, the defendants knew prior to the sale that the franchise was a " 'financial disaster,' " *id*. at 275, 354 N.W.2d at 151, but never disclosed this to the plaintiff.

This court found that the jury's finding of fraudulent misrepresentation in *Little* was supported by the facts. In regard to the defendants' argument that the plaintiff did not use ordinary prudence, this court stated:

> The [defendants] shed little light as to what investigation [the plaintiff] could have undertaken to ascertain that the previous operation was operated at a loss. She had asked for previous financial records, to no avail. Her suspicions were somewhat assuaged by the representations that she could make a profit by [two of the defendants], both of whom were experienced in business. The question of reliance was properly submitted to the jury, and it determined the issue adversely to the [defendants'] position. As the jury's determination was not clearly wrong, it will not be reversed on appeal.

*Id*. at 277, 354 N.W.2d at 152.

Unlike the circumstances set forth in *Little*, the facts in the instant case do not support a similar finding that Schuelke was justified in relying on Wilson's representations. In the case at bar, Wilson understood why Schuelke had concerns regarding the figures listed in the statements of profit. Wilson explained the reasons for making adjustments and explained that these figures were merely approximations. Unlike the defendants in *Little*, Wilson provided Schuelke with the necessary financial records. Furthermore, unlike the defendants in *Little*, rather

than attempting to alleviate any concerns of Schuelke, Wilson expressly told Schuelke to have these figures verified.

For the reasons stated above, we find the record does not support the district court's finding that Schuelke was entitled to rescission. Because Schuelke was not entitled to rescission, we need not address Schuelke's assignments of error. We reverse, and remand with directions that the district court address Wilson's counterclaim for payment of the promissory notes.

REVERSED AND REMANDED WITH DIRECTIONS.

FAHRNBRUCH, J., participating on briefs.